COMMONWEALTH vs. JAMES BLOOD
(and three companion cases[1]).

Essex. October 9, 1986. — May 20, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Eavesdropping. Search and Seizure,* Electronic surveillance, Expectation of privacy. *Constitutional Law,* Search and seizure, Privacy. *Privacy.*

Where a police informant consented to wear a concealed transmitter and thereby enabled the tape recording of several incriminating conversations, each occurring in a private home, the police activity, in the absence of any showing of exigent circumstances, exceeded the scope of warrantless surveillance permitted by art. 14 of the Massachusetts Declaration of Rights and, consequently, the recordings were improperly admitted in evidence at the conspiracy trial of two of the participants in the conversations, nothwithstanding the fact that the recordings fulfilled provisions of G. L. c. 272, § 99 B 4, which render admissible the evidentiary fruits of warrantless electronic surveillance of organized crime, where police have obtained the consent of at least one party to a conversation. [65-77] NOLAN, J., with whom LYNCH, J., joins, dissenting.

Although the fruits of an unconstitutional electronic surveillance were to be excluded from evidence at the retrial of conspiracy indictments, the live testimony of a participant in an unlawfully recorded conversation would be admissible. [77-78]

INDICTMENTS found and returned in the Superior Court Department on July 27, 1981.

A pretrial motion to suppress evidence was heard by *Robert J. Hallisey, J.,* and the cases were tried before *James D. McDaniel, Jr., J.*

The Supreme Judicial Court granted a request for direct appellate review.

[1] There were two conspiracy indictments against both James Blood and Ernest Lorenzen.

*Thomas C. Federico,* Committee for Public Counsel Services, for James Blood.

*Michael P. Cole* for Ernest Lorenzen.

*Robert J. Bender,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendants, James Blood and Ernest Lorenzen, were found guilty of conspiracy to break and enter a building and conspiracy to commit larceny. They assign as error the denial of their motions to suppress evidence gathered through warrantless electronic surveillance.[2] They argue inter alia that, if suppression was not mandated by G. L. c. 272, § 99 (1984 ed.), the Massachusetts communications interception statute, suppression was nonetheless required by art. 14 of the Massachusetts Declaration of Rights.[3] We agree with the latter contention. Therefore we reverse the convictions.

These convictions arise out of an alleged conspiracy to break into a building of the Eastern Smelting & Refining Corporation (Eastern) in Lynn. The object of this scheme was a cache of gold bars stored on Eastern's premises and valued at approximately $3,000,000. The object was not achieved, however,

---

[2] In addition, the defendant Blood seeks review of the admission at trial of statements made by alleged coconspirators, and he claims that the sentences imposed violate his rights under the double jeopardy clause of the Fifth Amendment to the United States Constitution. In the view we take of his case, it is unnecessary to reach these questions.

[3] Article 14 of the Massachusetts Declaration of Rights provides: "Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws."

Evidence obtained in violation of art. 14 has been held inadmissible. Compare *Commonwealth* v. *Ford,* 394 Mass. 421, 426 (1985), and *Commonwealth* v. *Bottari,* 395 Mass. 777, 784-785 (1985) (suppressing such evidence) with *Commonwealth* v. *Sheppard,* 394 Mass. 381, 390-391 (1985) (declining to suppress where violation of art. 14 was merely "technical" and search was not "unreasonable").

because one of the alleged conspirators, Charles Hudson, was a police informant.

The facts concerning the electronic surveillance are not in dispute. On April 25, 1981, Hudson met with Detective Lieutenant John F. Burns, a State police officer then on assignment as a major crime investigator. The meeting took place in the Cambridge police station where Hudson was being held after his arrest on the previous night for an attempted breaking and entering. Lt. Burns and Hudson knew each other because, in 1979, Burns had investigated a fire which destroyed Hudson's home. This investigation led to the indictment of Hudson for arson with intent to defraud his insurance company. After a trial in March, 1981, Hudson was convicted. His sentencing was scheduled to follow within two weeks, and he was allowed to post bail.[4] Hudson was aware that the prosecution intended to request that he be sentenced to a lengthy term at the Massachusetts Correctional Institution at Walpole (now Cedar Junction). Fearing that he would be killed by other inmates, he failed to appear for sentencing. Thus, at the time of his arrest on the breaking and entering charge, he was being sought by the police because of his sentencing default.

At the meeting on April 25, Hudson offered to furnish information to Burns concerning his knowledge of past and future crimes if a deal could be arranged concerning the charges pending against him. Eventually, an arrangement satisfactory to both sides was worked out. During one of their meetings, Lt. Burns learned of Hudson's involvement with Novia Turkette, Jr. (Turkette). Turkette was suspected by Federal and State law enforcement officials to be the leader of a criminal organization operating principally on the North Shore. Hudson informed Burns that Turkette and others were planning various crimes, including the theft of gold from Eastern. On May 15, 1981, Hudson agreed to wear a concealed transmitter during meetings with Turkette and others involved in the alleged con-

---

[4] Novia Turkette, Jr., posted the $500 bail. Hudson had known Turkette and his father for about fifteen years.

spiracy, and he consented to having the transmission recorded. No warrant was sought.

Hudson ultimately transmitted seven conversations, three of which were used by the prosecution at the trial of Blood and Lorenzen. The first recorded conversation admitted in evidence took place on May 18, 1981, at Lorenzen's home in Lynn. It involved Hudson, Lorenzen, Turkette, and Novia Turkette, Sr. (father). The principal purpose of the meeting was to secure Lorenzen's participation in the planned break into the Eastern plant. Lorenzen was at the time a Lynn police officer who served as the detail officer for the department. In that capacity, Lorenzen assigned police officers to various businesses and social functions. He explained the system of security cameras and their positioning throughout the Eastern plant. Turkette intended to cut an alarm wire outside the Eastern plant, which would summon the police. After the police arrived and concluded their investigation, a Lynn police officer would be assigned to guard the Eastern plant until the alarm was repaired. Lorenzen agreed to perform this role on the night of the break-in while the others entered the building from the rear.

The next recorded conversation introduced at trial took place ·at about 3:30 P.M. on May 27, 1981.[5] Hudson and Blood met with Turkette at his home in Peabody. Various aspects of that night's anticipated break-in were discussed, including Lorenzen's role and the best place to cut Eastern's alarm wire. In the early evening hours of May 27, Hudson and his wife went to Lorenzen's home. Lt. Burns followed in his automobile and recorded that meeting. Hudson informed Lorenzen that the "job" was set for later that night. Lorenzen assured Hudson that he would take the police detail himself when the telephone call came. He also told Hudson that a gold shipment had arrived at Eastern that afternoon. After leaving Lorenzen's house, Hudson met with Burns to complete the plan for that evening.

---

[5] Lt. Burns recorded an earlier conversation that day between Hudson, the father, and Blood in the restaurant of the Osmond Hotel in Lynn. Although the tape recording of this conversation was not suppressed by the judge, it was not used by the Commonwealth at trial because its poor quality rendered the contents inaudible.

Shortly afterward, Hudson, Blood, Walter Woodyatt, Turkette, and Dorothy Teague met at the home of Turkette's sister in Lynn. Taking two cars, they drove to a hotel a short distance from the plant. Just before 10 P.M., Turkette and Woodyatt entered the grounds of the Eastern plant. They cut the alarm wire, which emitted a signal monitored at the Wells Fargo Alarm Services in Chelsea. Meanwhile, Teague sat in her automobile listening to a police scanner radio while Hudson and Blood kept watch from a nearby parking lot where they could observe the Eastern plant. After the signal was received at Wells Fargo, police were notified to go to Eastern to investigate. There were no indications of a break-in. A telephone call was placed to Lorenzen to dispatch an off-duty officer to Eastern to secure it until the wire could be repaired. As planned, Lorenzen arrived to watch the front of the building. On observing too much police activity near Eastern, however, the conspirators abandoned their effort.

On July 27, an Essex County grand jury returned indictments against Blood and Lorenzen charging them with conspiracy to break and enter a building in the nighttime with an intent to commit a felony and conspiracy to commit larceny. Each indictment identified Dorothy Teague, Walter Woodyatt, Novia Turkette, Jr., and Novia Turkette, Sr., "or any of them" as coconspirators. In October, 1981, all the alleged coconspirators, with the exception of the Turkettes, filed motions to suppress evidence of the electronic surveillance. The motions were heard over eight days between November 20 and December 8, 1981. On February 22, 1982, the judge denied the motions to suppress with regard to four conversations recorded with the consent of a participant and granted the motions with regard to three recordings found to violate G. L. c. 272, § 99. The cases of Blood and Lorenzen were tried together before an Essex County jury. The jury returned guilty verdicts on the indictments in February, 1983.

At issue in this appeal is the sufficiency, in light of art. 14, of that portion of the statutory design which renders admissible the evidentiary fruits of warrantless electronic surveillance of organized crime where police have obtained the consent of at

least one, but not each, party to a conversation. The statute in question is G. L. c. 272, § 99, as appearing in St. 1968, c. 738, § 1.[6] Section 99 P of c. 272 allows defendants in criminal cases to move to suppress the contents of any electronically intercepted wire or oral communication or any evidence derived therefrom if the communication was "unlawfully intercepted" or "not intercepted in accordance with the terms of this section." The secret transmission or recording of oral communications without the consent of *all* parties is generally proscribed by § 99. See §§ 99 C 1 and 99 B 4.

But there are two exceptions applicable where electronic surveillance is performed by State or local police when investigating statutorily designated offenses related to organized crime.[7]

---

[6] The specific statutory provision in issue is G. L. c. 272, § 99 B 4, which provides: "The term 'interception' means to secretly hear, secretly record, or aid another to secretly hear or record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication; provided that it shall not constitute an interception for an investigative or law enforcement officer, as defined in this section, to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined herein."

We consider only the issue whether the exception from the definition of "interception" beginning with the word "provided" is sufficient to meet the requirements of art. 14 as to a warrantless electronic surveillance which intrudes on reasonable privacy expectations. We conclude, in the circumstances of this case, that this statutory exemption does not meet the mandate of art. 14. We note, however, that we need not reconsider the question of the constitutionality of this section in other circumstances. See, for example, *Commonwealth* v. *Thorpe,* 384 Mass. 271, 285-286 (1981), cert. denied, 454 U.S. 1147 (1982) (no violation of art. 14 where police officer, known to be such, recorded conversation secretly). See generally, as to the constitutionality of § 99, *Commonwealth* v. *Vitello,* 367 Mass. 224 (1975). We note, additionally, as to G. L. c. 272, § 99, that St. 1968, c. 738, § 7, declares that any invalidity of any provision of the act "shall not affect other provisions or applications of the act" and that "the provisions of [the] act are declared to be severable."

Thus, what we hold here is simply this: Evidence not suppressible under the statute, in circumstances such as this, may be suppressible nevertheless under the requirements of art. 14.

[7] In tandem with their constitutional claim, the defendants argue that their motions to suppress were improperly denied because Lt. Burns did not act

First, the statute exempts from its ban on nonconsensual eaves-dropping all acts of electronic surveillance performed pursuant to a warrant in conformance with §§ 99 F-99 M. See § 99 D 1. Second, in the absence of a warrant, such acts are excepted from the definition of a proscribed "interception" if performed by an officer who is himself a party, or who has the consent of a party, to the conversation. See §§ 99 B 4 and 99 C 1.

Thus, because the statute does not outlaw surveillance of organized crime involving statutorily designated offenses where investigators have either a warrant or "one party consent," the fruits of surveillance so conducted are not statutorily suppressible. The defendants concede that warrantless surveillance with "one party consent" has been held to lie beyond the protective reach of the Fourth Amendment to the United States Constitution. See *United States* v. *Caceres,* 440 U.S. 741, 750-751 (1979), relying on *United States* v. *White,* 401 U.S. 745, 751 (1971).[8] But they argue, and we agree, that it remains

on a reasonable suspicion that surveillance would lead to evidence of a statutorily designated offense in connection with organized crime. We do not reach these questions because they are mooted by our decision that warrantless electronic surveillance of private conversations may be in violation of art. 14 even where one party consents. However, on the question whether "organized crime" was the subject of the investigation, see *Commonwealth* v. *Thorpe, supra.* See also *Turkette* v. *United States,* 604 F. Supp. 667, 668 (D. Mass. 1985) (referring to Turkette as the "ring leader and mastermind of a sophisticated, experienced and extremely well-organized gang of criminals"). As to whether a designated offense was involved, we note also that one indictment alleged a conspiracy to commit larceny, an offense specifically designated by G. L. c. 272, § 99 B 7.

[8] The Supreme Court's reasoning in *White, supra,* has been rejected by numerous commentators and judges. See, e.g., 1 W. LaFave, Search and Seizure § 2.2(e), at 362-365 (2d ed. 1987); Donovan, Informers Revisited: Government Surveillance of Domestic Political Organizations and the Fourth and First Amendments, 33 Buffalo L. Rev. 333, 367-379 (1984); Falkow, Electronic Surveillance: Protection of Privacy Expectations in Participant Monitoring Cases, 1984 Ann. Survey Am. Law 55, 57-58; Loewy, The Fourth Amendment as a Device for Protecting the Innocent, 81 Mich. L. Rev. 1229, 1252-1254 (1983); Comment, The Assumption of Risk Doctrine: Erosion of Fourth Amendment Protection Through Fictitious Consent to Search and Seizure, 22 Santa Clara L. Rev. 1051, 1064-1068 (1982); Galloway, The Uninvited Ear: The Fourth Amendment Ban on Electronic General Searches, 22 Santa Clara L. Rev. 993, 1018 n.97 (1982); Walinski & Tucker, Expectations of Privacy: Fourth Amendment Legitimacy Through

an open question whether such surveillance lies within the scope of art. 14. See *Commonwealth* v. *Thorpe,* 384 Mass. 271, 285-286, cert. denied, 454 U.S. 1147 (1982).[9]

When we confront the question whether police activities amount to a search or seizure within the meaning of art. 14, we ask "whether the defendants' expectation of privacy [in the circumstances] is one which society could recognize as reasonable." *Commonwealth* v. *Podgurski,* 386 Mass. 385, 388 (1982), relying on *Rakas* v. *Illinois,* 439 U.S. 128, 143 n.12 (1978); *Katz* v. *United States,* 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Accord *Commonwealth* v. *Ford,* 394 Mass. 421, 423-424 (1985). Privacy is " 'the claim of individuals, groups, or institutions to determine for themselves when, how, and to.what extent information about them is communicated to others.' A. Westin, Privacy and Freedom [1967] at 7)." *Holmes* v. *Burr,* 486 F.2d 55, 67 (9th Cir.), cert. denied, 414 U.S. 1116 (1973) (Hufstedler, J., dissenting). The privacy interests protected under art. 14 (and the Fourth Amendment) exist when it is shown "that a person [has] exhibited an actual (subjective) expectation of privacy," and when that "expectation [is] one that society is prepared to recognize as 'reasonable.' " *Katz* v. *United States, supra* (Harlan, J., concurring). Since the conversations at issue took place in private homes, and there is no evidence to suggest that the participants intended the contents to become more widely known, we conclude that the participants exhibited a subjective expectation of privacy.

We consider whether society at large would think it reasonable for the defendants to expect that, in normal course, conversations held in private homes will not be broadcast and

State Law, 16 Harv. C.R.-C.L.L. Rev. 1, 16 n.57 (1981); Note, The Supreme Court, 1970 Term, 85 Harv. L. Rev. 38, 250-258 (1971). See also *Thorpe, supra* at 283-285, and authorities cited.

[9] We have often recognized that art. 14 of the Declaration of Rights does, or may, afford more substantive protection to individuals than that which prevails under the Constitution of the United States. See *Commonwealth* v. *Upton,* 394 Mass. 363, 371-373 (1985), and cases cited. See also *Commonwealth* v. *Amaral,* 398 Mass. 98, 101 (1986); *Commonwealth* v. *Ford,* 394 Mass. 421, 424 (1985); *Commonwealth* v. *Sheppard,* 394 Mass. 381, 383 (1985).

recorded surreptitiously. At common law "[i]t is certain every man has a right to keep his own sentiments, if he pleases. He has certainly a right to judge whether he will make them public, or commit them only to the sight of his friends. Yates, J., in *Millar* v. *Taylor,* 4 Burr. 2303, 2379 (1769)." Warren & Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 198 n.2 (1890). The Legislature also has recognized the reasonableness, within limits, of every person's claim to control the flow of personal information. This recognition is found, not only in the Fair Information Practices Act, G. L. c. 66A (1984 ed.), and in the statutory right to privacy, G. L. c. 214, § 1B (1984 ed.), but also in those other provisions of § 99 which outlaw electronic eavesdropping by ordinary citizens without the consent of *all* parties to a conversation. See G. L. c. 272, §§ 99 C 1 and 99 B 4. Thus, it has long been thought reasonable to expect that what is supposedly said only to friends or close associates will not become generally, indiscriminately known or "etched in stone" without the speaker's consent.

Article 14, like the Fourth Amendment, was intended by its drafters not merely to protect the citizen against "the breaking of his doors, and the rummaging of his drawers," *Boyd* v. *United States,* 116 U.S. 616, 630 (1886); but also "to protect Americans in their beliefs, their thoughts, their emotions and their sensations" by conferring, "as against the government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men." *Olmstead* v. *United States,* 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting). But it is not just the right to a silent, solitary autonomy which is threatened by electronic surveillance: It is the right to bring thoughts and emotions forth from the self in company with others doing likewise, the right to be known to others and to know them, and thus to be whole as a free member of a free society. "[I]t must be plain that electronic surveillance imports a peculiarly severe danger to the liberties of the person. . . . And we must bear in mind that historically the search and seizure power was used to suppress freedom of speech and of the press . . . , and that today, also, the liberties of the person are indivisible. 'Under Hitler, when it became known that the secret police planted dictaphones in houses, members of

families often gathered in bathrooms to conduct whispered discussions of intimate affairs, hoping thus to escape the reach of the sending apparatus.' *United States* v. *On Lee,* 193 F.2d 306, 317 [1951] (dissenting opinion)." (Citations omitted.) *Lopez* v. *United States,* 373 U.S. 427, 469-470 (1963) (Brennan, J., dissenting).

The instruments of electronic eavesdropping are peculiarly adapted to search our thoughts and emotions. Thus, these devices are peculiarly valuable to those charged with policing crimes, such as the crime of conspiracy at issue here. Indeed, the modern art of eavesdropping may be invaluable in the multitude of situations where specific intent must be proved. But, because the peculiar virtues of these techniques are ones which threaten the privacy of our most cherished possessions, our thoughts and emotions, these techniques are peculiarly instrusive upon that sense of personal security which art. 14 commands us to protect.

Therefore, in circumstances not disclosing any speaker's intent to cast words beyond a narrow compass of known listeners, we conclude that it is objectively reasonable to expect that conversational interchange in a private home will not be invaded surreptitiously by warrantless electronic transmission or recording. The remaining question is whether "one party consent" so alters the balance as to obviate the need for a warrant requirement. It does not.[10] Such consent only affords the State a person willing to transport the invisible instruments of eavesdropping into "earshot."[11]

---

[10] We do not, of course, preclude the propriety of warrantless electronic surveillance conducted on probable cause in exigent circumstances. See *Commonwealth* v. *Ortiz,* 376 Mass. 349, 355-358 (1978); *Selectmen of Framingham* v. *Municipal Court of the City of Boston,* 373 Mass. 783, . 785-786 (1977).

[11] If there is logic underlying the notion that one party consent obviates the need for judicial supervision, it is logic reminiscent of a bygone era in constitutional jurisprudence. As a practical matter, that surveillance which escapes the statutory warrant requirement by way of the consent exception is eavesdropping accomplished by an undercover agent or informer. Since such a person, if he is admitted as a "party" to a conversation, is likely to be a licensee or invitee in the place where it occurs, such eavesdropping is unlikely to involve trespassory acts of intrusion on property rights. Such acts would not have been of Fourth Amendment significance in the first half of the Twentieth Century, because at that time it was "insisted only that the electronic device not be planted by an unlawful physical invasion

The vice of the consent exception is that it institutionalizes the historic danger that art. 14 was adopted to guard against. "British search policies generally are acknowledged to have spurred on revolutionary sentiment in colonial Massachusetts. Opposition to the search policies centered upon the use by British customs house officers of the writs of assistance, general warrants which allowed officers of the crown to search, *at their will,* wherever they suspected untaxed goods to be . . ." (emphasis supplied) (footnotes omitted). *Commonwealth* v. *Cundriff,* 382 Mass. 137, 143 (1980), cert. denied, 451 U.S. 973 (1981). "[T]he colonists' memory of the use and abuse of the writs was one of the reasons for the adoption, by several colonies, of constitutional safeguards regulating searches. In 1780 Massachusetts enacted art. 14 of the Massachusetts Declaration of Rights, specifically condemning 'unreasonable searches, and seizures.' . . . The antipathy of Massachusetts colonists to the writs of assistance was forcefully expressed by James Otis in the Massachusetts Superior Court in 1761. . . . Otis is said to have stated in his argument that the writ of assistance was 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of the constitution, that ever was found in an English lawbook. . . . It is a power that places the liberty of every man in the hands of every petty officer.' " (Citations omitted.) *Id.* at 144. In like manner, the consent exception puts the conversational liberty of every person in the hands of any

---

of a constitutionally protected area." *Lopez* v. *United States, supra* at 438-439, citing *Silverman* v. *United States,* 365 U.S. 505 (1961). So long as that requirement was met, acts of electronic surveillance were thought to be beyond the scope of constitutional protections against unreasonable searches and seizures. In the years since *Lopez,* however, "[t]he premise that property interests control the right of the Government to search and seize has been discredited." *Warden, Md. Penitentiary,* v. *Hayden,* 387 U.S. 294, 304 (1967). Today, "the reach of [the Fourth Amendment and, we add, art. 14] cannot turn upon the presence or absence of a physical intrusion into any given enclosure." *Katz* v. *United States,* 389 U.S. 347, 353 (1967). Thus, the nontrespassory nature of surveillance done with one party consent is no longer relevant; nor do we perceive any relevance which survives.

officer lucky enough to find a consenting informant. What was intolerable in 1780 remains so today.

In counterpoint to these considerations, however, the Commonwealth relies primarily on three arguments. None is persuasive. The first of these arguments asserts, according to the Commonwealth, that because "the person subject to the warrantless interception is a 'wrongdoer,' [he] should be made to bear the risk of betrayal."[12] This argument proceeds from a pernicious assumption, that anyone subjected to surveillance by police is, because of that fact, necessarily a "wrongdoer." It is the purpose of the warrant requirement in art. 14

---

[12] The theory that speakers assume the risk their auditors are "wired" was stated by Justice White for the plurality in *White* in these words: "Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa* v. *United States,* [385 U.S. 293, 300-303 (1966)]. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, *Lopez* v. *United States,* [373 U.S. 427 (1963)]; (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee* v. *United States,* [343 U.S. 747 (1952)]. If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." *United States* v. *White,* 401 U.S. 745, 751 (1971) (plurality opinion; adopted as controlling, *United States* v. *Caceres,* 440 U.S. 741, 750-751 [1979]).

In *Hoffa* v. *United States, supra,* the informant was not equipped with transmitter or recorder; the decision had nothing to do with electronic surveillance. The decision in *Lopez* v. *United States, supra,* did involve surreptitious recording with the consent of one party, but no transmission took place; conversely, while the decision in *On Lee* v. *United States, supra,* involved transmission, no recording was involved; and both decisions were based, not on consideration of the defendants' expectations of privacy, as was required in 1971 at the time of *White* by the Court's 1967 decision in *Katz* v. *United States,* 389 U.S. 347, 357 (1967), but on outmoded considerations that "no trespass was committed," *On Lee, supra* at 751, or that "the device was not planted by means of an unlawful physical invasion of petitioner's premises," *Lopez, supra* at 439. Thus, the *White* thesis is a recent invention that is not sustained by precedent.

to subject police suspicions to the scrutiny of "a neutral and detached magistrate instead of [leaving them to be] judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States,* 333 U.S. 10, 14 (1948). Little would be left "of anyone's justifiable reliance on privacy . . . if everyone must realize that he will be free from warrantless electronic intrusion only so long as someone in the government does not suspect him of improper conduct or wrong thinking[.]" *Holmes* v. *Burr,* 486 F.2d 55, 72 (9th Cir. 1973) (Hufstedler, J., dissenting).

"[T]he relevant question is not whether criminals must bear the risk of warrantless surveillance, but whether it should be imposed on all members of society. *United States* v. *White, supra* at 786, 789-790 (Harlan, J., dissenting)." *Commonwealth* v. *Thorpe,* 384 Mass. 271, 285 (1981). The *White* plurality underestimated this risk because it perceived no distinction of constitutional moment between the common gossip and the "wired" informant. See *United States* v. *White, supra* at 751-752. For us, however, a distinction lies in the disparity between that sense of security which is felt among trusted friends and the feelings of hostility encountered among competitors or combatants. The sense of security is essential to liberty of thought, speech, and association.

We think it a constitutional imperative to recognize that "the differences between talking to a person enswathed in electronic equipment and one who is not are very real, and they cannot be reduced to insignificance by verbal legerdemain. All of us discuss topics and use expressions with one person that we would not undertake with another and that we would never broadcast to a crowd. Few of us would ever speak freely if we knew that all our words were being captured by machines for later release before an unknown and potentially hostile audience. No one talks to a recorder as he talks to a person." *Holmes* v. *Burr, supra* at 72 (Hufstedler, J., dissenting).[13]

---

[13] To gauge the likely impact of unfettered surveillance on the individual's sense of security, and to appreciate the absurdity of the *White* rationale, one need only imagine the kind of person who *does* think it reasonable that his every word is overheard and seized for use against him. "He easily becomes suspicious and distrustful. He finds it difficult to confide in others,

The Commonwealth urges consideration of the principle developed in *White* that "a defendant who has no constitutional right to exclude the informer's unaided testimony . . . has [no constitutional] privilege against a more accurate version of the events in question." *Id.* at 753. We do not dispute the premise that arguably more accurate evidence may be gathered if police electronically record conversations than if a participant trusts solely to his memory when testifying. And we agree that a criminal defendant cannot rely on the exclusion of the testimony of an informer's personal, unmediated account of what was said. See *Hoffa* v. *United States,* 385 U.S. 293, 302-303 (1966); *Commonwealth* v. *Jarabek,* 384 Mass. 293, 299 (1981). The probative value of evidence wrongfully obtained does not, however, justify a search or seizure in defeat of constitutional safeguards. Cf. *Katz* v. *United States,* 389 U.S. 347, 357 (1967) (excluding highly probative evidence seized in violation of the Fourth Amendment); *Commonwealth* v. *Ford,* 394 Mass. 421, 426-427 (1985) (same in response to violation of art. 14).

We conclude that it is unreasonably intrusive to impose the risk of electronic surveillance on every act of speaking aloud to another person. We cannot conclude that, in the absence of a warrant, the consent of less than all the partakers of a conversation is sufficient to waive any participant's rights pursuant to art. 14 not to be recorded. "If a person commits his secret thoughts to paper, that is no license for the police to seize the paper; if a person communicates his secret thoughts verbally [*sic*] to another, that is no license for the police to record the words. . . . The right of privacy would mean little if it were limited to a person's solitary thoughts, and so fostered secre-

---

and if he does confide . . . he expects to be betrayed. . . . [H]e is a person with lifelong tendencies toward secretiveness, seclusiveness, and solitary rumination, although these may be concealed behind a brittle façade of superficial social give and take. . . . [To him, people] are unpredictable as well as untrustworthy; they must be watched." 1 N. Cameron, Paranoid Conditions and Paranoia, American Handbook of Psychiatry 512-513 (1959) (describing the paranoid personality disorder). The world of the *White* thesis is a topsy-turvy one in which the paranoid's delusory watchfulness is the stance held "reasonable."

tiveness." (Citations omitted.) *Lopez* v. *United States*, 373 U.S. 427, 449 (1963) (Brennan, J., dissenting).

Finally, the Commonwealth argues that G. L. c. 272, § 99, was adopted by the Legislature with full opportunity to debate the proper balance between the competing public interests in law enforcement and individual security,[14] and that this legislative determination should be dispositive concerning society's evaluation of the "reasonableness" of the defendants' expectations and the intrusiveness of consensual surveillance. Like all acts of the Legislature, § 99 is presumed constitutional; beyond that, however, the historic fact of the Legislature's choice does not relieve us of our constitutional obligation to review the validity of a search and seizure in light of art. 14.

It was the Legislature's clear intent when enacting the current version of § 99 to preserve the power of the Commonwealth's police to use tools of electronic surveillance and to ensure their access to every technological option that is constitutionally permissible in pursuit of organized crime.[15] The Legislature stated, however, that "[t]he use of [modern electronic surveillance] devices by law enforcement officers must be conducted under strict judicial supervision." G. L. c. 272, § 99 A (Preamble). And it required that law enforcement officials report annually "the number of applications made for warrants during the previous year," G. L. c. 272, § 99 R (1), presumably to end "[t]he secrecy of the past" which some members of the Legislature's Special Commission on Electronic Eavesdropping

---

[14] See *Commonwealth* v. *Thorpe, supra* at 280 n.7.

[15] Prior to enactment of § 99 in its current form, the Legislature had been advised that the law then in effect (St. 1959, c. 449, § 1) was unconstitutional in light of *Berger* v. *New York*, 388 U.S. 41 (1967). Report of the Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132, at 5. Pursuant to the Fourth Amendment, the Court in *Berger* had struck down a New York statute because (a) it clearly did not require that warrants would issue only on a showing of probable cause, (b) it permitted warrants so lacking in "particularization" as to amount to general warrants, and (c) it did not require notice or a showing of facts to justify secret surveillance. *Berger* v. *New York, supra* at 54-60. The statute passed by the Legislature was thus concerned with saving the techniques of electronic surveillance from Fourth Amendment bans; this was accomplished by inclusion of detailed warrant provisions that are now found in G. L. c. 272, §§ 99 F - 99 M.

viewed as "both destructive and alien to a democracy." Report of the Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132, at 10.

The reports required by § 99 R (1) are public documents, and we take judicial notice that the office of the Attorney General has had no such applications to report since 1980, while the office of the district attorney for the Suffolk District reported one request for 1985, three for 1984, and none for 1983. In these circumstances, we can only conclude that, if meaningful amounts of electronic surveillance are being performed by the police of this Commonwealth, almost all of it is being done pursuant to the exception for participant monitoring, in secret, and without judicial supervision of any kind. See Carr, Electronic Surveillance by Consent Under State Law, 11 Search & Seizure L. Rep. 77 (Nov., 1984) ("court-ordered surveillance . . . plays a minor role in day-to-day law enforcement"; warrantless participant monitoring is "far more frequent and common"). Clearly, the balance intended by the Legislature — police empowered to use electronic surveillance but only "under strict judicial supervision" — has not been achieved in practice, because the statutory exception has swallowed up the rule.[16]

Judicially supervised use of electronic surveillance by law enforcement officers is not forbidden by art. 14. See *Commonwealth* v. *Vitello,* 367 Mass. 224 (1975). "[I]t is too easy to forget — and, hence, too often forgotten — that the issue here is whether to interpose a search warrant procedure between law enforcement agencies engaging in electronic eavesdropping and the public generally. . . . Interposition of a warrant requirement is designed not to shield 'wrongdoers,' but to secure a measure of privacy and a sense of personal security throughout

---

[16] We are mindful that the showing which police must make to obtain warrants passing constitutional muster is extensive. See, e.g., *Berger* v. *New York, supra*; G. L. c. 272, §§ 99 F - 99 M. Conformance with such requirements may be viewed as inconvenient for police, especially when compared with the ease of "wiring" an informant. In many ways, however, it is the ease of participant monitoring which renders it a threat to the citizens of a free society.

our society." *United States* v. *White,* 401 U.S. 745, 789-790 (1971) (Harlan, J., dissenting).

No warrant was sought by Lt. Burns. Three days elapsed between Hudson's agreement to be wired and the taping of the first conversation admitted in evidence; nine more days elapsed before a second conversation was taped. Thus, we perceive no exigency which prevented the procurement of a warrant. See *Commonwealth* v. *Ortiz,* 376 Mass. 349 (1978); *Selectmen of Framingham* v. *Municipal Court of the City of Boston,* 373 Mass. 783 (1977); G. L. c. 272, § 99 P 1; § 99 P 5. Each conversation whose recorded contents was admitted at trial had unfolded in a person's home, in circumstances not even remotely suggestive of any speaker's intent to be heard beyond the circle of known listeners. As to each of those conversations, we hold that its warrantless electronic search by surreptitious transmission and its electronic seizure by surreptitious recording were in violation of art. 14. We further conclude that this case involves circumstances in which art. 14 requires exclusion of evidence. See *Commonwealth* v. *Ford,* 394 Mass. 421, 426 (1985). The searches and seizures being illegal, the fruits thereof must also be suppressed. See *Commonwealth* v. *Bottari,* 395 Mass. 777, 785 (1985). Accord *Wong Sun* v. *United States,* 371 U.S. 471 (1963). Because the recordings introduced at trial were fruits of illegal searches and seizures, these convictions are reversed.[17]

In the event that Blood and Lorenzen are retried, a question may arise concerning the kind of testimony which must be excluded. Clearly, any testimony derived from either the transmissions or the recordings is inadmissible. Therefore, no one who has listened either to the transmissions or to the recordings may testify as to anything thus heard. No evidence derived from those acts of eavesdropping may be admitted.[18]

---

[17] Reversal of both his convictions moots the defendant Blood's claim that the double jeopardy clause was violated by imposition of sentences on both charges. Concerning his claim that hearsay statements by coconspirators were impermissibly admitted, we do not reach the merits because no timely objection was made.

[18] The rule adopted today applies to the defendants in these cases and to the defendants in all cases now pending on direct appeal where the record

Hudson himself, however, may testify concerning the conversations in which he took part. As we have previously noted, "[e]ven those Supreme Court Justices most adamantly opposed to warrantless surveillance have agreed that the exclusionary rule would not extend to live testimony of a participant in an unlawfully recorded conversation. See *Osborn* v. *United States,* 385 U.S. 323, 352 (1966) (Douglas, J., dissenting); *Lopez* v. *United States,* [373 U.S. 427, 464-465 (1963)] (Brennan, J., dissenting). Similarly, State courts that have excluded from evidence illegally obtained accounts of conversations have refused to exclude testimony by the participant as to statements spoken to him directly, when that testimony was in no way the fruit of the statutorily or constitutionally infirm action. E.g. *People* v. *Beavers,* 393 Mich. 554, 567 (1975); *State* v. *Smith,* 72 Wis. 2d 711, 714 (1976)." *Commonwealth* v. *Jarabek,* 384 Mass. 293, 299 (1981). Moreover, the defendants themselves do not argue that Hudson's unmediated testimony should be excluded. See *Hoffa* v. *United States,* 385 U.S. 293, 302-303 (1966). Without deciding whether such testimony is admissible in all cases, we see no reason why it should be excluded in this one.

The order denying the defendants' motions to suppress is set aside. An order allowing the motions is to be entered in the Superior Court. The judgments of conviction are reversed and the verdicts set aside.

*So ordered.*

NOLAN, J. (dissenting, with whom Lynch, J., joins). By some legerdemain, the court today has pulled from the hat a statement that art. 14 of the Massachusetts Declaration of Rights prohibits the Legislature from making an eminently reasonable judgment that organized crime is a greater threat to the people of the Commonwealth than is a warrantless electronic search conducted under very restrictive conditions.

is adequate to raise the issue. *Commonwealth* v. *Soares,* 377 Mass. 461, 493 n.38, cert. denied, 444 U.S. 881 (1979). See *Commonwealth* v. *Breese,* 389 Mass. 540, 546-549 (1983), and cases cited.

Article 14 protects individuals only from unreasonable searches and seizures. There must be found a "search" or seizure before we concern ourselves with whether warrantless surveillance is unreasonable. There can be no search of an area where a person has no reasonable expectation of privacy. Section 99 B 4 represents an inescapable legislative judgment that members of organized crime who converse about a designated offense do not have a reasonable expectation of privacy in that conversation. This is a sound judgment.

Yet somehow, in a way that strains credulity, the court manages to evade society's judgment. Since art. 14 protects people, not places, the location of the conversation is constitutionally immaterial. It is the conversation that is being searched and not the home. These defendants are not passive victims of governmental intrusions into their zones of privacy. Rather, by taking Hudson into their confidence the defendants effectively extended their zones of privacy to include him. There is no constitutional principle that prohibits Hudson from disclosing confidential information to the police. Moreover, even if a person's home is where he has the most reasonable expectation of privacy, that expectation of privacy is no longer reasonable when the home becomes a site for planning criminal activity. But more importantly, § 99 B 4 informs this court that society does not recognize that expectation as reasonable. It is also incredible for the court to maintain that it is "objectively reasonable" that these defendants did not expect their conversation to be electronically recorded. At best, the only expectation that these defendants could reasonably have possessed is that the police who might have been listening were doing so because they had a warrant. But this expectation was not "objectively reasonable" because § 99 B 4 allows the police to forgo obtaining a warrant in these circumstances.

What is most remarkable, however, are the sources the court utilizes to determine that the defendants' expectations of privacy were "objectively reasonable." *Ante* at 70. The court disregards the statute and instead relies on a few dissenting opinions to tell us what the people of Massachusetts consider reasonable. Until today, I had assumed that the court looked

to external reference points to determine what society considers reasonable. Of course, I also assumed that a determination of society's reasonable expectations is merely a descriptive endeavor and not infused with whatever normative content judges think such expectations should possess. *Rakas* v. *Illinois,* 439 U.S. 128, 143 n.12 (1978).

Even assuming that the defendants had a reasonable expectation of privacy in these circumstances, the question is whether the police conduct was "unreasonable." This determination is essentially a cost-benefit analysis. Under art. 14, we balance "the nature of the particular form of warrantless surveillance and its likely impact on the individuals' sense of security." *Commonwealth* v. *Thorpe,* 384 Mass. 271, 285 (1981), cert. denied, 454 U.S. 1147 (1982). The "nature" of the surveillance authorized by § 99 B 4 is that the police must satisfy four requirements before they can bypass the warrant process. The police must (1) have the consent of a party to a conversation which (2) they reasonably suspect will (3) involve organized criminals (4) planning a designated offense. Here the police scrupulously observed these preconditions. Hudson, a member of the criminal conspiracy, transmitted a number of conversations to the police involving only other members of the conspiracy and discussing only that conspiracy. I am unable to comprehend how "free speech and privacy values are unduly threatened by the risk that when one [member of an organized criminal conspiracy] speaks to a known [member of the same conspiracy] he may be recording the conversation." *Id.*

It is only by employing a truncated analysis that the court is able to arrive at the result that the statute is irrational. The court states that the question is "whether 'one party consent' so alters the balance as to obviate the need for a warrant requirement." *Ante* at 70. The court's magic act is most apparent in how it frames the issue. Suddenly the other three statutory requirements disappear and only one-party consent remains. Before this court can tell the Legislature that it has acted irrationally, the court must at least perform the same balancing test as the Legislature did. In short, the court asks and answers the wrong question. But even if this statute allowed warrant-

less surveillance where the police had the consent of a party, it would still be reasonable.

This statute represents a modern response to a modern problem. The framers of the Massachusetts Declaration of Rights did not foresee the development of electronic surveillance just as they could not imagine the formation of highly organized and disciplined criminal groups. They did, however, intend that art. 14 and other provisions provide the framework in which the republican ideals of liberty and order could flourish. But the court demands a liberal interpretation of art. 14 so that modern privacy rights are protected, while it insists upon a narrow reading when the needs of modern law enforcement are considered. In the guise of protecting privacy, it only protects those who are its greatest threat. I dissent.