Doerfer, J.
Defendants Derek Garner and Markeith Garner are each charged with two counts of armed robbery while masked, aggravated rape, assault and battery with a deadly weapon, and unlawful possession of a sawed-óff shotgun. Defendants now move to suppress evidence seized by police as a result of a search and seizure conducted pursuant to a search warrant. Defendants claim that the search warrant was: (1) issued without probable cause; (2) executed in violation of the knock and announce requirement; and (3) executed with impermissible and excessive force. Defendants argue that the police action violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article Fourteen of the Massachusetts Declaration of Rights.
The Commonwealth contends that the police validly executed a search warrant supported by probable cause and that the police did not violate defendants’ constitutional rights.
BACKGROUND
On September 2, 1994, New Bedford police officers from the Special Reaction Team executed a no-knock search warrant for lottery tickets and other stolen items located at defendant Derek Garner’s residence at 1261 Church Street, BuildingD, Apartment 39, New Bedford, Massachusetts.
In support of the search warrant application, Detective Paul J. Rozario (Rozario) had filed an affidavit, in which Rozario reported the following relevant information:
*630 (1) That on 8/30/94 at approximately 0300 HRS Store 24 being worked at that time by ANGELA NEWETT was robbed by two black males whom were both masked and wearing what appeared to be, dark colored shirts over their mouths and tied behind their heads, and baseball caps worn backwards on their heads armed with a shotgun and a handgun. During the course of this robbery Miss NEWETT was forced to the back room of the store where she was raped by one of the culprits at gunpoint, and a class ring from Bristol Aggie with her initials and a blue stone in it, were stolen from her in addition to 3-other gold colored rings, 1-14kt, gold wedding ring. A customer who had entered the store during the course of the robbery ANDRE CARDOZA was forced to lie on the floor by the second culprit also at gunpoint, at which time the culprit proceeded to rob CARDOZA of this wallet which contained $13.00 in assorted bills of U.S. Currency, along with the following items: ANDRE CARDOZA’S drivers license, & the following credit cards, DISCOVER CARD, MASTER CARD, SEARS CHARGE, J.C PENNY, CHERRY & WEBB, FILENE’S, TEXACO & SILVERSTEINS CHARGE also contained in the wallet was B. J. WHOLESALE CLUB [MEMBERSHIP] CARD, A BLOCKBUSTER VIDEO [MEMBERSHIP] CARD & L.A. VIDEO MEMBERSHIP CARD all of which list the name & have the [signature] of Mr. CARDOZA on same.
Taken from the store during the robbery was an undetermined [amount] of cash, approx. (3) three cartons of NEWPORT 100 BOX CIGARETTES and the following lottery tickets which were identified by the store manager as being ticket pack numbers J764715 FROM WHICH 50 Tickets (00-50) were taken & E784246 from which 43 tickets (00-43) were taken, after taking these items the culprits fled the store in an unknown direction.
Rozario then recited several attempts by a white female, described as 5’ 7" tall, heavyset, several months pregnant, with shoulder length light brown hair, to cash lottery tickets at various convenience stores. At each location, a warning alerted the store clerk that here was something wrong with the ticket presented or that it might have been stolen. After reviewing police photo arrays, a few of the clerks positively identified the white female as one Sharon Hubbard (Hubbard). The other store clerks were unable to identify Hubbard as the white female who entered the store to cash the tickets. One store clerk did indicate that after leaving his store, Hubbard got into a white Büick, two-door automobile with tinted windows which was occupied by two black male passengers.
On September 1, 1994, the police conducted a surveillance of Hubbard and observed her driving a white 1980 Buick Regal with tinted windows. The police saw Hubbard pick up an unidentified black male in New Bedford and followed the two as they drove to three separate all night convenience stores. The police then obtained a search warrant for Hubbard’s home based on a belief that she was still in possession of some of the stolen lottery tickets from the Store 24 robbery. On September 2,1994, the police conducted a search of Hubbard’s home and she was arrested. Hubbard provided the police with the following information as noted in Rozario’s affidavit:
(10) That on 8/30/94 at approx. 4:00 a.m., that Sharon Hubbard was visited at her home by her boyfriend Derek Garner and his nephew Markeith Garner, who when entering her home at that time, were armed with a sawed off shot-gun and small silver handgun, and that they also had in their possession: a large amount of change, estimated to be approx. 15-20 dollars worth, a white plastic bag containing several hundred .lottery tickets, a large amount of assorted U.S. Paper currency, (of which the two later split up between themselves, being $65.00 each), a ladies class ring described as being silver in color with a light blue stone (of which they told Sharon they had taken from the female clerk at Store 24), and a man’s [silver]-gold wedding band, of which they claimed they had found outside of Store 24. In her asking them where they had gotten all of this, they told her that they had just robbed Store 24 on Ashley Blvd. whereby Derek Garner had forced the female clerk to strip because she wouldn’t give him the key to the video-tape machine, and, that they had also robbed a male that had entered the store while the robbeiy was taking place.
(11) That after leaving Sharon’s home at approx. 4:30 a.m. 8/30/94, that [Sharon] drove both of these males to 164 Hathaway Rd., whereby Markieth [sic] left the vehicle for a short time to place his gun in that house, and they later all went out to cash the lottery tickets.
(12) That on 8/30/94 after Sharon, Derek Garner, and Markeith Garner attempted cashing the stolen lottery tickets until approx. 2:30 pm., that she dropped both Derek Garner and Markeith Garner, off at Derk’s [sic] Home at 1261 Church St. New Bedford, Ma. whereby Derek had taken a suitcase into the house as he normally did, which contained his shotgun in it in addition to the lottery tickets and other stolen items from the robbery.
Based on this information, Rozario asserted that there was probable cause to believe that the stolen lottery tickets, jewelry, a shotgun and handgun were being kept at Derek Garner’s home. Rozario requested an arrest warrant for the defendants and a search warrant for Derek Garner’s home. Rozario also requested a no-knock warrant based on his concern that the defendants were in possession of weapons and to prevent the destruction of evidence.
*631 Lieutenant Hebert (Hebert) of the New Bedford Police Department is in charge of training operations and was assigned to head this particular warrant execution. Hebert testified that he had met with the Special Reaction Team for a briefing just before the raid and was informed that Hubbard had provided information about the potential occupants and the layout of the apartment, and had identified the back bedrooms as being adult bedrooms. The Special Reaction Team was aware that a pregnant woman and her two children were in the apartment, although the ages of the children were not known. Hebert testified that he had assigned an officer to protect the woman and children and to get them out of the apartment when the Special Reaction Team moved in. Further, the Special Reaction Team had conducted surveillance before the raid, and that they were not concerned about a sniper threat, hostage or terrorist activity or barricades. He had posted four snipers in the woods surrounding the Church Street apartment, and had intended to call the apartment by cellular phone just prior to the raid but, due to timing problems, the call was not made. Hebert’s plan of action was to create an “overload of sensations” by deploying a pyrotechnic stun grenade and bursting into the apartment before the occupants could react. Pyrotechnic stun grenades are diversionary devices that are designed to create loud noise and a large quantity of smoke, but not to cause fire. Hebert acknowledged that pyrotechnic stun grenades are inherently dangerous and bear warnings that misuse can cause physical injury or death.
Hebert testified that under the law, only persons who have been specially trained may deploy such devices. The New Bedford police officers had received the required training, and the department had a policy relating to the use of these devices. The policy required that the officer deploying the device break a window, look in to see if there are any occupants, then drop the device into the room. Hebert testified that he instructed New Bedford Police Officer Levine (Levine) to deploy the device by breaking a window, looking in, then tossing the device into the room.
When (he warrant was executed, Derek Garner was present in the apartment along with two other adults, Marla Rose and her brother Edward Rose, and one of Marla Rose’s two children. Before the police entered the apartment, Derek Garner and Marla Rose were in the living room area, Marla Rose’s four-year old daughter was in a back bedroom, and Edward Rose was preparing to leave the apartment. Levine broke a window in a back bedroom and threw a pyrotechnic stun grenade device into that room to create the diversion. The grenade exploded with a bright flash and filled the apartment with smoke. The child was in the bedroom where the stun grenade was deployed. As Edward Rose opened the front door, police officers dressed in black military outfits and equipped with masks came through the door. During the excited activity accompanying the police entrance into the apartment, Marla Rose, who was 5V2 months pregnant at the time, was struck in the face and abdomen by a door. The child was screaming, crying and gagging from the smoke in the room. The officers conducted a protective sweep and secured the apartment within three or four minutes. None of the occupants presented any resistance to the officers.
After complaining of feeling ill, Marla Rose was eventually taken to the hospital for treatment. Her daughter was also treated a few days later for a health complaint associated with smoke inhalation, and continues to suffer from nervousness, crying and nightmares.
The New Bedford Police Department did not interview Levine about his actions in deploying the pyrotechnic stun grenade device, and Levine did not testify during the hearing before this court on the defendants’ motions.
Finally, during the search of the apartment, the officers seized a quantity of items including a sawed-off shotgun and assorted live and spent ammunition, identification and credit cards bearing names other than the occupants’ names, jewelry that could match the description of items taken during the robberies, and clothing that could match the description of clothing worn by the perpetrators during the robberies.
DISCUSSION
I. Markeith’s standing.
In order to have standing to contest the constitutionality of a search and seizure, the defendant must first show that his constitutional rights, not those of another, were violated. Commonwealth v. King, 389 Mass. 233, 240 (1983). In other words, the defendant has the burden of establishing that he had a reasonable expectation of privacy in the place that was searched or the item seized before being able to assert that the search was illegal and that the evidence should be suppressed. Commonwealth v. Glowacki, 398 Mass. 507, 512 (1986); Commonwealth v. Santoro, 406 Mass. 421, 422 (1990).
The motion filed on behalf of Markeith Garner does not assert any interest that he had in the apartment at 1261 Church Street, and at the hearing on the motion, no such interest was asserted. He did not claim to be a tenant or to have lived in the apartment at any time, and he was not present at the time of the search. Further, because Markeith Garner may be charged with unlawfully possessing a sawed-off shotgun during the robbery, the “automatic standing” rule under article 14 of the Massachusetts Declaration of Rights, adopted by the Supreme Judicial Court in Commonwealth v. Amendola, 406 Mass. 592, 596-601 (1990), does not aid him in this case. See id. at 601 (holding that rule applies when a defendant is charged with a crime in which possession of the seized evidence at the time of the search is an essential element of *632 guilt); Commonwealth v. Mora, 402 Mass. 262, 267 (1988). The court concludes that Markeith Garner had no legitimate expectation of privacy in the premises at 1261 Church Street, and lacks standing to challenge the constitutionality of the search.
II. Probable Cause
In order to establish probable cause a search warrant affidavit must “contain enough information for the issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they may reasonably be expected to be located in the place to be searched.” Commonwealth v. Fenderson, 410 Mass. 82, 88 (1991), quoting Commonwealth v. Cefalo, 381 Mass. 319, 328 (1980). Probable cause requires more than mere suspicion but less than evidence sufficient to warrant a conviction. Commonwealth v. Hason, 387 Mass. 169, 174 (1982). In reviewing the warrant application to determine whether probable cause to issue the warrant existed, the court should read the affidavits in an ordinary, common-sense manner without hypertechnical analysis. Commonwealth v. Melendez, 407 Mass. 53, 60 (1990). In reviewing a probable cause determination, only facts revealed on the face of the affidavit and any reasonably inferences may be considered. Commonwealth v. Allen, 406 Mass. 575, 578 (1990); Commonwealth v. Jean-Charles, 398 Mass. 752, 757 (1986).
If an informant is named in an affidavit, the information carries an indicia of reliability. Commonwealth v. Bakoian, 412 Mass. 295, 301, quoting Commonwealth v. Atchue, 393 Mass. 343, 347 (1984). The informant’s reliability may also be buttressed by an informant who participated in or witnessed a crime. See Atchue, supra at 347-48. In addition, a statement made against the informant’s penal interest may be considered in bearing on the informant’s reliability. Commonwealth v. Spano, 414 Mass. 178, 186 (1992); Commonwealth v. Melendez, 407 Mass. 53, 57 (1990); Commonwealth v. Higginbotham, 11 Mass.App.Ct. 912, 913 (1981), citing Commonwealth v. Vynorius, 369 Mass. 17, 21 (1975) (statement received from a participant in the criminal enterprise carry their own indicia of reliability sufficient to support a finding of probable cause to search). When an informer provides specific and detailed information it can be inferred that the informant has direct knowledge of the defendant and his or her criminal activity, based on the informant’s personal observations and contacts. Commonwealth v. Cast, 407 Mass. 891, 897 (1990).
The named informant in this case, Hubbard, stated that she personally observed the stolen items and weapons, as noted in Rozario’s affidavit, in the possession of the defendants. The level of specific detail in her information would also suggest to the magistrate that she was relying on something more than a casual rumor. Commonwealth v. Robinson, 403 Mass. 163, 166 (1988). By providing this information to the police, Hubbard may have also implicated herself as an after-the-fact participant in the defendants’ crimes and thus she may have reasonably feared that her statements would subject her to prosecution. Such statements against her penal interest lend an indicia of reliability to her information.
An affidavit must not be based on stale information; it must contain facts sufficiently fresh to suppose that probable cause will exist at the time the warrant is executed. Commonwealth v. Watson, 36 Mass.App.Ct. 252, 256 (1994); Commonwealth v. . Higginbotham, 11 Mass.App.Ct. 912, 914 (1981). In considering staleness in determining the existence of probable cause, the “affidavit need not demonstrate that the items sought are in fact on the premises at the time, but need only provide the issuing magistrate with a substantial basis for concluding that any such articles are probably there.” Higginbotham, supra at 914.
Since the criminal activity in the instant case had occurred only two days prior to the issuance of the search warrant the information provided to the magistrate was sufficiently fresh. See Watson, supra at 256 (four days between informant’s observations and issuance of warrant not stale); Commonwealth v. DiStefano, 22 Mass.App.Ct. 535, 540 (1986) (eight days not stale); Higginbotham, supra at 914 (twelve days not stale). In addition, since the items sought in the warrant were not a readily disposable commodity, the magistrate could have concluded that with the passage of only two days, the items were still in Derek Garner’s apartment.
After reviewing the affidavit as a whole, I rule that from the facts presented in the affidavit and any reasonable inferences drawn therefrom, the information provided to the magistrate supported a finding of probable cause to issue the search warrant of the subject premises.[1]
III. No-Knock Provision
Ordinarily, police officers must knock, announce their identity, state their purpose, and be refused admittance, before attempting to forcibly enter a private dwelling to execute a search warrant, unless the circumstances justify dispensing with one or all of these requirements. Commonwealth v. Antwine, 417 Mass. 637, 638 (1994); Commonwealth v. Cundriff, 382 Mass. 137, 140-47 (1980); Watson, supra at 258. “The policies underlying the announcement rule at common law include decreasing the potential for violence, the protection of privacy, and the prevention of unnecessary damage to homes.” Antwine, supra at 638 (citations omitted).
Exceptions to this rule exist where the police have reason to fear for their own safety or that of others, where the person inside the dwelling to be entered has knowledge of the officers’ purpose and presence, and where making an announcement would facilitate a suspect’s escape or the destruction of evidence. Commonwealth v. Rodriguez, 415 Mass. 447, 450 (1994); *633 Cundriff, supra at 147 n.15; Commonwealth v. Munera, 31 Mass.App.Ct. 380, 384 (1991).
In the instant case, based on Hubbard’s information, the police were warranted in having a reasonable belief that weapons might be present on the premises and that a no-knock warrant was needed for their safety when entering Derek Garner’s apartment. Commonwealth v. Bui, 419 Mass. 392, 395 (1995); Rodriguez, supra at 451; Munera, supra at 380; Commonwealth v. Allen, 28 Mass.App.Ct. 589, 595 (1990). In addition, there were no changed circumstances as to the presence of weapons at the premises which would have required the police officers at the scene to dispense with the-no-knock authorization and instead announce their presence. See Commonwealth v. Scalise, 387 Mass. 413, 421 (1982).
IV. Execution of the Search Warrant
The method used in executing a search warrant is generally left to the discretion of the police officers who are at the scene. Dalia v. United States, 441 U.S. 238, 257 (1979); Commonwealth v. Corriveau, 396 Mass. 319, 336 n.6 (1985). However, this discretion is not without limitation as the action taken is subject to the general Fourth Amendment protection against reasonable searches and seizures. Dalia, 441 U.S. at 257; United States v. Baker, 16 F.3d 854, 856 (8th Cir. 1994).
“Determining whether the force used to effect a particular seizure is ‘reasonable’ under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the countervailing governmental interests at stake.” Graham v. Connor, 490 U.S. 386, 396 (1989). The prevailing test for determining reasonableness was laid out by the Court in Graham. It is an objective test and, with respect to a claim of excessive force, the “reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene.” Id.; Terry v. Ohio, 392 U.S. 1, 19 (1967).
The issue presently before the court is whether the diversionary tactics utilized by the police in executing the search warrant were reasonable, as that term is defined under the Fourth Amendment. As stated above, the court must apply the standard of objective reasonableness based upon the mindset and understanding of a reasonable officer on the scene. Terry, 392 U.S. at 19; Graham, 490 U.S. at 396. Therefore, in light of what the officers at the scene knew at the time the search was conducted, this court must decide if the use of the pyrotechnic diversionary device was necessary, and thus reasonable conduct, to effect a safe entry into the dwelling. See Baker, 16 F.3d at 856 (use of stun grenade found reasonable when police had information that the door was barricaded and there were attack dogs within the dwelling).
When formulating a plan to execute a search warrant, the police must consider factors such as the likelihood that the door may be barricaded or reinforced an thus will require more time and effort to breach. See id. Moreover, it would be prudent for the police to conduct surveillance of the area to determine if the house was fortified or the inhabitants were monitoring activity in the area. Baker, 16 F.3d at 855-56. In addition, a factor which should affect any decision to use pyrotechnic devices as a diversionary tactic in a home is a determination of who may be in the house at the time the search is conducted. See United States v. Stewart, 867 F.2d 581, 585 (10th Cir. 1989) (forcible entry to execute search warrant was not justified where “no effort was made to determine who was in the house at the time the entry was made. This information became crucial once it was decided to use the stun grenade”).
It is instructive to compare a recent unpublished decision, based upon similar facts, by the Court of Appeals for the Tenth Circuit. United States v. Green, No. 93-1284, 1994 U.S. App. LEXIS 11087 (10th Cir. May 17, 1994). In this case, the police obtained a no-knock warrant to search a suspected crack house. Immediately before entering the apartment on the warrant, the police inserted a flash-bang diversionary device into the bathroom window. After activating the device, the police executed the search warrant and seized several items. The defendant then filed a motion to suppress, asserting that the diversionary device constituted unreasonable force in executing the warrant under the Fourth Amendment.
The Court of Appeals for the Tenth Circuit held that the force used to execute of the warrant was not unreasonable. Specifically, the court pointed to the facts that no one was injured, there were no children present, and that the officers had knowledge from an informant regarding the presence of weapons and drugs in the dwelling. Id. at *13.
The officers in the present case knew that the defendant was in the apartment and that he was probably armed. They also knew that two small children and their pregnant mother were present in the house. Although the police had conducted surveillance, no effort was made to determine whether the apartment was barricaded or fortified, or if the occupants of the home were monitoring the area for police activity. There was no indication that a hostage situation existed or that any activities within the apartment were endangering its inhabitants. In short, the officers did not possess information that warranted the strength of the police assault on the premises.
Furthermore, the device was deployed in a child’s bedroom where a child was present. Although there was testimony that the officer who had deployed the device had been instructed to look into the room before throwing in the device, there was no evidence offered to show that the officer had in fact done so. I infer from *634 this gap in the evidence, where the police were in the position to offer this evidence but did not, that the officer did not look into the room before throwing in an inherently dangerous device. The police cannot even claim that their actions were in good faith because the deployment of the device was not in accordance with the department’s own policy. Moreover, if the officer had looked into the room, it is more than likely that he would have seen the child, and the decision to deploy the device is then all the more egregious. As a result of the police attack, the child has continued to suffer from emotional injuries sustained as a result of the assault and use of the stun grenade by the officers.
After examining the facts and circumstances of this case, I conclude that the warrant was executed with excessive force, which rendered the search unreasonable under the Fourth Amendment.[2] The method of entry used was not necessary under the circumstances known to the police at that time. Under the familiar purposes of the exclusionary rule, as an imperative of judicial integrity and to deter unreasonable searches in the future, Derek Garner’s motion to suppress the evidence seized during the unconstitutional search ar 1261 Church Street, Apt. 39, must be allowed.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendant Markeith Garner’s motion to suppress the evidence seized at 1261 Church Street, Apt. 39, is DENIED. It is further ORDERED that defendant Derek Garner’s motions to suppress the evidence seized at 1261 Church Street, Apt. 39 is ALLOWED.

Derek Garner also contends that the affidavit did not support the probable cause required to search his apartment because the affidavit only mentions that Hubbard dropped defendants off at 1261 Church Street, New Bedford without any statement as to what apartment or building the defendants then entered. However, since the affidavit stated that Derek Garner was Hubbard’s boyfriend and that she dropped the defendants off at Derek Garner’s home, an inference could reasonably be made that Hubbard knew the exact apartment where Derek Garner resided and provided police with that information. Furthermore, the magistrate could have inferred that the defendants would have taken the stolen items and weapons to Derek Garner’s apartment since the Defendants were dropped off at Derek Garner’s address.

Therefore, I need not consider whether the level of force violates the more substantive protection afforded to criminal defendants by article 14 of the Massachusetts Declaration of Rights.