Doerfer, J.
BACKGROUND
Defendant Derek Gamer is charged with two counts of armed robbery while masked, aggravated rape, assault and battery with a deadly weapon and unlawful possession of a sawed-off shotgun. On May 29, 1997, this Court held a hearing on the defendant’s motion to suppress evidence seized at his residence at 1261 Church Street, Building D, Apartment 39 pursuant to a no-knock search warrant. In a Memorandum of Decision and Order dated May 8, 1996, this Court ordered that said evidence be suppressed on the ground that the warrant was executed with impermissible force in violation of the Fourth Amendment to the United States Constitution [5 Mass. L. Rptr. 629). Specifically, this Court found that the New Bedford police’s deployment of a pyrotechnic diversionary device to execute the warrant constituted excessive force which rendered the search and seizure unreasonable. The Commonwealth took an interlocutory appeal to a single justice of the Supreme Judicial Court, who then reported the case to the full court. In an opinion dated November 8, 1996, the SJC vacated the order suppressing the evidence, holding that the execution of the warrant was reasonable under the Fourth Amendment, and remanded the case to this Court for further proceedings consistent with its opinion. Since the decision by this Court and the SJC’s review thereof were based solely on the Fourth Amendment, on December 2, 1996 the defendant requested Findings of Facts and Rulings of Law Pursuant to Massachusetts Declaration of Rights, Article 14. This Court held a hearing on May 29, 1997 at which the defendant and Commonwealth argued the reasonableness of the execution of the warrant under Article 14. For the reasons discussed below, the defendant’s motion to suppress the evidence pursuant to Article 14 of the Declaration of Rights is DENIED.
FACTS
The facts as previously found by this Court are as follows. On August 30, 1994 at 3:00 a.m., a Store 24 on Ashley Boulevard in New Bedford was robbed by two black men wearing masks, dark-colored shirts and baseball caps, and armed with a shotgun and a handgun. During the robbery, the clerk was forced to the back room of the store where she was raped at gunpoint by one of the robbers, who then stole from her three gold rings, a wedding band and a class ring bearing her initials. A customer in the store was forced at gunpoint to lie on the floor by the second robber, who then stole his wallet containing $13, a driver’s license, a Blockbuster Video membership card and numerous credit cards. Taken from the store during the robbery was an undetermined amount of cash, three cartons of Newport 100 cigarettes and 93 lottery tickets.
The following day, New Bedford police learned that a woman later identified as Sharon Hubbard (Hubbard) had attempted to cash some of the stolen lottery tickets at various convenience stores. Police obtained a search warrant for Hubbard’s home based on a belief that she was still in possession of some of the stolen lottery tickets. After Hubbard’s home was searched and she was arrested, Hubbard informed police that her boyfriend, Derek Garner (Garner), and his nephew, Markieth Garner, had visited her home at 4:00 a.m. on August 30 and had in their possession a sawed-off shotgun and small silver handgun, a large amount of change and paper currency, a white bag full of several hundred lottery tickets, and several gold rings including a class ring. When Hubbard asked where they had gotten these items, they replied that they had robbed a Store 24 on Ashley Boulevard. Based on this information, New Bedford police obtained arrest warrants for Derek and Markieth Garner and a search warrant for Gamer’s residence at 1261 Church Street, Building D, Apartment 39 in New Bedford. Police were issued a no-knock warrant based on concerns both that the defendants were in possession of the sawed-off shotgun and handgun, and that they might attempt to destroy the evidence of the robbery if given warning of the presence of police.
Lieutenant Hebert of the New Bedford Police Department, who is in charge of training operations, was assigned to head the execution of the warrant. He met with the Special Reaction Team for a briefing just before the raid and learned that Hubbard had provided information about the potential occupants and physical layout of Garner’s apartment. Hubbard had stated that a pregnant woman and her two children, of unknown age, were in the apartment and had identified the back bedrooms as being adult bedrooms. Hebert assigned an officer to protect the women and children and to get them out of the apartment when the Special Reaction Team moved in. Four snipers were posted in the woods surrounding the apartment and surveillance was conducted before the warrant *26 was executed. Lieutenant Hebert’s plan of action was to create an overload of sensations by deploying a pyrotechnic stun grenade, bursting into the apartment before the occupants could react, and quickly making the arrests.
Pyrotechnic stun grenades are diversionary devices that are intended to create loud noises and a large quantity of smoke, but not to cause fire. However, the warning label on the device used by New Bedford police states that it “contains explosive composition that could cause serious bodily injury or death if misused." Under the law, only persons who have been specially trained may deploy such devices and New Bedford police officers had received the required training. Lieutenant Hebert instructed New Bedford Police Officer LaVoie to deploy the stun grenade by breaking a window, looking into the room to see if there were any occupants and then tossing the grenade into the room. The instructions for use on the grenade’s label state “throw the device in an underhand manner to an area free of personnel, loose debris and ignitable materials.”
When the warrant was executed, Garner was present in the apartment with two other adults, Marla Rose and her brother Edward Rose, and one of Marla’s two children. Before police entered the apartment, Garner and Marla were in the living room, Edward Rose was preparing to leave the apartment, and Marla’s four-year-old daughter was in a back bedroom. Officer LaVoie broke a window in the back bedroom where the child was and threw the stun grenade into the room to create the diversion.[1] The grenade exploded with a bright flash and filled the apartment with smoke. As Edward Rose opened the front door to leave the apartment, police officers dressed in black military outfits and wearing masks came through the door. During the excited activity accompanying the police entrance, Marla Rose, who was five and a half months pregnant, was struck in the face and abdomen by a door. The child was screaming, crying and gagging from the smoke. Police officers conducted a protective sweep and secured the apartment within three or four minutes. None of the occupants presented any resistance to the officers. After complaining of feeling ill, Marla Rose was eventually taken to the hospital. Her daughter was treated a few days later for smoke inhalation and continues to suffer from nervousness, crying and nightmares.
During the search of the apartment, police seized numerous items including a sawed-off shotgun and assorted live and spent ammunition, identification and credit cards bearing names other than the occupants’ names, j eweliy matching the description of the items taken during the robbery and clothing matching the description of that worn by the robbers. Defendant Derek Gamer now seeks to suppress this evidence on the ground that the deployment of the stun grenade in executing the warrants constituted excessive force, rendering the search and seizure unreasonable under Article 14 of the Declaration of Rights.
DISCUSSION
I. THE SJC’s FOURTH AMENDMENT ANALYSIS
In its November 8, 1996 opinion reviewing this Court’s order to suppress the evidence, the SJC articulated the Fourth Amendment standard for the method of executing a search warrant as follows: while left to discretion of the executing officers, the method of execution chosen must be reasonable under the circumstances. Commonwealth v. Garner, 423 Mass. 735, 744 (1996). While acknowledging that an unreasonable execution of a warrant may violate the Fourth Amendment, the SJC concluded that the deployment of a stun grenade in the present case was reasonable given that police had probable cause to believe that the defendants, alleged to have committed the violent offenses of armed robbery and rape, were armed with a sawed-off shotgun inside the apartment, such that a surprise entry with overwhelming force may have seemed the best way to avoid a deadly gun battle. Id. at 744-45.
The SJC emphasized that the Fourth Amendment does not require that the method of execution chosen by police be necessary to effect a safe entry, or even be the best possible method to effect such an entry. Rather, all that is required to satisfy the Fourth Amendment is that the method of executing the warrant be reasonable. Id. at 744. Finally, the Court declined to adopt a requirement that police seek prior judicial authorization for the use of stun grenades in executing a warrant, noting that the device was just one of many modes and devices by which an entry may be effected in a variety of difficult and dangerous circumstances. Id. at 745. Because the SJC explicitly stated in its opinion that it had no claim before it under the Declaration of Rights, see id. at 739-40, Garner now seeks rulings of law -with respect to whether the deployment of a stun grenade was unreasonable under Article 14.
II. THE ARTICLE 14 ANALYSIS
Like the Fourth Amendment, Article 14 of the Massachusetts Declaration of Rights protects the individual against unreasonable search and seizures. Case law in several areas of search and seizure jurisprudence illustrates the Article 14 requirement that police conduct be reasonable.
Use of Force during an Investigative Stop
Under Article 14, investigative or “Terry’’ stops by police are subject to a principle of proportionality: the degree of intrusiveness on the suspect’s personal security, including considerations of time, space and force, must be reasonably related to the degree of suspicion that prompted the intrusion. Commonwealth v. Bottari, 395 Mass. 777, 782; Commonwealth v. Borges, 395 Mass. 788, 793-94 (1985); Commonwealth v. Andrews, 34 Mass.App.Ct. 324, 329, rev. den., 415 Mass. 1104 (1993). Once reasonable suspicion for an investigative stop is established, the perti *27 nent inquiry is whether the degree of the police intrusion is reasonable in the circumstances. Commonwealth v. Moses, 408 Mass. 136, 141 (1990); Commonwealth v. Varnum, 39 Mass.App.Ct. 571, 575 (1995). The test is one of objective reasonableness, although the subjective intent of the investigating officer may in some cases be relevant. Commonwealth v. Sanderson, 398 Mass. 761, 766 (1986); Commonwealth v. Varnum, supra at 575; Commonwealth v. Stawarz, 32 Mass.App.Ct. 211, 213 (1992).
In evaluating whether the degree of force used by the police in a “Terry” encounter was excessive, the crucial question is the extent of the danger at the time the police used force, because police are entitled to take reasonable precautions for their protection. Commonwealth v. Robbins, 407 Mass. 147, 151-52 (1990); Commonwealth v. Johnson, 413 Mass. 598, 600 (1992); Commonwealth v. Owens, 414 Mass. 595, 600 (1993); Commonwealth v. Willis, supra at 820. It is well established, however, that suspicion that the person encountered has an illegal gun does not itself justify the use of force, absent other fear-provoking circumstances. Commonwealth v. Bottari, supra at 782; Commonwealth v. Willis, supra at 820.
Thus, for example, where an informant told a Boston police officer “There’s a Joseph Bottari who has a big gun and it looks like a Magnum and he’s got no license and he’s at the Assembly Mall” and further stated that Bottari had a 1978 Oldsmobile with license number 112DET, and the officer relayed the information to two Somerville police officers, who observed the described vehicle in the parking lot of the mall, 45 minutes later observed four people approaching the car, drove their cruiser to the rear of the parked car so it could not leave, and drew their guns, ordering the four people out of the car, the officers’ use of force was unreasonable, requiring suppression of the evidence. Commonwealth v. Bottari, supra at 782.
Nighttime Searches
Another example of the Article 14 requirement that police conduct be reasonable is found in the cases concerning searches executed at night. At common law there was a strong hostility to nighttime searches of a dwelling, based on the rationale that nighttime police intrusion posed a great threat to privacy, violated the sanctity of the home, and endangered both police and slumbering citizens. Commonwealth v. Hinds, 145 Mass. 182, 183-184 (1887): Commonwealth v. Grimshaw, 413 Mass. 73, 75 (1992). Pursuant to G.L.c. 276, §2, however, a search warrant may be executed in the nighttime where the warrant so directs, and the magistrate need not identify a specific reason to authorize a nighttime search. Commonwealth v. Grimshaw, supra at 77; Commonwealth v. Yazbeck, 31 Mass.App.Ct. 769, 773 (1992).
Nonetheless, a search executed under a nighttime warrant is still subject to the reasonableness requirement of Article 14 of the Declaration of Rights. Commonwealth v. DiStefano, 22 Mass.App.Ct. 535, 542 (1986); Commonwealth v. Garcia, 23 Mass.App.Ct. 259, 261 (1986); Commonwealth v. Yazbeck, supra at 773. For example, a search for narcotics conducted at 6:00 p.m. was not unreasonable under Article 14 where the police knocked before their entry, the defendant and his wife were the only parties present in the apartment, and neither of them were in a state of undress when the officers entered. Commonwealth v. Garcia, supra at 263-264. Further, a nighttime search where police broke in the front door with a sledgehammer was not unreasonable where an undercover policeman heard the defendant discuss an 11:00 meeting, police had probable cause to believe a large quantity of narcotics was involved, police observed before entering that a television set was on in the living room, and the defendants failed to respond to numerous knocks and announcements by the police. Commonwealth v. Yazbeck, supra at 773-74. Thus, the reasonableness of a nighttime search under Article 14 depends on all the circumstances in a given case.
Use of Force in Executing an Arrest
Finally, although it has not cast its analysis in constitutional terms, the SJC has stated that a police officer may use force reasonably necessary under the circumstances to effect an arrest. Commonwealth v. Young, 326 Mass. 597, 602 (1950). See also Powers v. Sturtevant, 199 Mass. 265, 266 (1908). Further, the SJC has cited with approval Model Penal Code Section 3.07 pertaining to the use of force justifiable to effect an arrest. Commonwealth v. Klein, 372 Mass. 823, 830 (1977) (involving private citizen’s right to use force to apprehend a criminal). A police officer may use such non-deadly force as is reasonably necessary to effect a lawful arrest, so long as the officer makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person arrested and, when the arrest is made under a warrant, the warrant is valid or believed to be valid. Commonwealth v. Klein, supra at 830 & n.7; Julian v. Randazzo, 380 Mass. 391, 396 (1980) (discussing a police officer’s tort liability from the use of force). Further, the use of deadly force[2] to make an arrest is justifiable if the arrest is for a felony, the officer reasonably believes that the force employed creates no substantial risk to innocent persons, and the officer reasonably believes either that the crime involved conduct including the use or threatened use of deadly force or that there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed. Commonwealth v. Klein, supra at 831-832 & n. 7. See also Commonwealth v. Young, supra at 602.
Thus, the cases concerning the use of force during an investigative “Terry” seizure, the execution of a search warrant in the nighttime, and the use of force in executing an arrest reveal that Article 14 of the Declaration of Rights requires police conduct in exe *28 cuting a search and seizure to be objectively reasonable under the circumstances, in light of factors such as the safety of police and the public, the public interest in apprehending criminals and evidence of crime and the privacy, safety and property interests of defendants. This would appear to be the same standard applied by the SJC in analyzing under the Fourth Amendment the propriety of the deployment of a stun grenade to execute the search warrant in the present case.
Nonetheless, Garner contends rather broadly that Article 14 of Massachusetts’ Declaration of Rights offers criminal defendants more protection with respect to the reasonableness of police methods of executing a warrant than does the Fourth Amendment. The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Article 14 of the Declaration of Rights provides:
Every subject has a right to be secure from all unreasonable searches, and seizures, ofhis person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause of foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure; and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws.
The SJC has stated that Article 14 may in some circumstances provide more substantive protection to criminal defendants than does the Fourth Amendment. Commonwealth v. Upton, 394 Mass. 363, 373 (1985); Commonwealth v. Blood, 400 Mass. 61, 68 n. 9 (1987); Commonwealth v. Amendola, 406 Mass. 592, 599 n.3 (1990). Moreover, the Court has concluded that there need not be dramatically different language in the two provisions in order for it to reach a different opinion concerning the application of similar constitutional principles. Commonwealth v. Upton, supra at 373; Commonwealth v. Amendola, supra at 599 n.3. The instances in which Article 14 has been deemed more protective than the Fourth Amendment are relatively few but diverse in nature. It is therefore difficult to discern a guiding principle to apply when faced with an argument such as Garner’s.[3] However, the areas of search and seizure law where the SJC has concluded that Article 14 provides more substantive protection for defendants can be categorized into two rough categories: cases where the SJC was reacting to a decision by the U.S. Supreme Court eroding rights previously given to a defendant under the Fourth Amendment and cases involving administrative-type searches unsupported by probable cause.
Cases Reacting to U.S. Supreme Court’s Erosion of Rights
In two areas of search and seizure law where Article 14 has been deemed more protective than the Fourth Amendment, the SJC was clearly reacting to a shift in thinking on the U.S. Supreme Court which abrogated a more protective interpretation of the Fourth Amendment in favor of a less protective one. In the area of probable cause for a search warrant, for example, the Supreme Court abandoned the Aguilar-Spinelli test, which requires separate showings of both the basis of an informant’s knowledge and the circumstances from which the affiant concluded that the informant was credible, in favor of a flexible standard of the totality of the circumstances. Illinois v. Gates, 462 U.S. 213 (1983). The SJC, however, deemed the totality of the circumstances standard to be unacceptably shapeless and permissive, lacking the precision that should be articulated in defining probable cause, and thus retained the more stringent Aguilar-Spinelli test as a matter of state constitutional law. Commonwealth v. Upton, 394 Mass. 363, 364, 373-77 (1985).
The SJC took a similar approach with respect to the automatic standing rule, adopted by the Supreme Court in 1960, that, a defendant charged with a crime in which possession of the seized evidence at the time of the search is an essential element of guilt has automatic standing to challenge the validity of the search and seizure so that he need not incriminate himself by alleging that he had a possessoiy interest in either the contraband seized or the premises searched in order to establish standing. United States v. Jones, 362 U.S. 257 (1960). Twenty years later, the Supreme Court reasoned that a defendant no longer needed an automatic standing rule to protect his right against self-incrimination in light of the Court’s 1968 decision in Simmons v. United States, 390 U.S. 377, that a defendant’s testimony given in support of a motion to suppress cannot be admitted as evidence of his guilt at trial. United States v. Salvucci, 448 U.S. 83, 87-88 (1980). The SJC, however, retained the automatic standing rule under Article 14 of the Declaration of Rights, reasoning that the decision in Simmons did not resolve the self-incrimination dilemma associated with standing, since testimony offered at a motion to suppress could still be used to impeach the defendant at trial. Commonwealth v. Amendola, 406 Mass. 592, 599-600 (1990).
Thus, with respect to probable cause based on information from a confidential informant and automatic standing for crimes of possession, the SJC retained the substantive protection of former Supreme Court decisions under the Fourth Amendment by adopting them as requirements under Article 14 of the *29 Declaration of Rights. The present case, however, does not implicate this rationale for finding Article 14 more protective than the Fourth Amendment since the U.S. Supreme Court has not recently eroded defendants’ rights with respect to the reasonableness of police methods of executing a warrant. Indeed, as acknowledged by the SJC’s opinion in the present case, strong Fourth Amendment precedent in this area of the law does not exist. Commonwealth v. Garner, 423 Mass. at 743.
Cases Involving Searches Without Probable Cause
The SJC has also found Article 14 to provide more substantive protection to criminal defendants than the Fourth Amendment in the area of administrative-type searches not supported by probable cause. For example, the U.S. Supreme Court has suggested that under the Fourth Amendment, the government need not show a particularized interest in conducting random drug testing on a certain segment of the population, so long as it has a compelling interest in preventing an otherwise pervasive social problem from spreading to the particular context. Skinner v. Railway Labor Executives Ass’n, 489 U.S. 602, 607 (1989) (upholding drug testing based on finding that drug use by railroad employees is nationwide problem); National Treasury Employees Unionv. Von Rabb, 489 U.S. 656, 675 (1989) (upholding drug testing without a documented history of drug use by customs officers); Vernonia School District 47J v. Acton, 132 L.Ed2d 564, 579-581 (1995) (upholding testing of school athletes based on government’s compelling interest in deterring drug use by the nation’s schoolchildren, but also noting lower court’s findings with respect to drug problem in the school at issue).
The SJC, however, has held that under Article 14, the reasonableness of random, non-consensual drug testing cannot be supported by unsubstantiated possibilities or facts assumed by the court; rather, the government must demonstrate a concrete, substantial interest in conducting such testing on that particular segment of the population. Guiney v. Police Commissioner of Boston, 411 Mass. 328, 332 (1991). Thus, random drug testing of Boston police officers could not be justified by reference to “some generalized sense that there is a drug problem in this country, in Boston, or in the Boston police department and that random urinalyses of police officers will solve, or at least help to solve, the problem or its consequences.” Id. at 333.
Further, the U.S. Supreme Court has held that the Fourth Amendment requires that inventory searches be conducted pursuant to reasonable and standardized police regulations in order to reduce the discretion of police to search at will and lessen the possibility that police will use inventory procedures as investigative searches. South Dakota v. Opperman, 428 U.S. 364, 374-76 (1976); Colorado v. Bertine, 479 U.S. 367, 374-76 (1987); Florida v. Wells, 495 U.S. 1, 4-5 (1990). The SJC has gone one step further, holding that under Article 14, police inventory procedures can be considered “standardized” only if they are set forth in writing. Commonwealth v. Bishop, 402 Mass. 449, 451 (1988); Commonwealth v. Garcia, 409 Mass. 675, 681 (1991); Commonwealth v. Figueroa, 412 Mass. 745, 748 (1992). The purpose of standardized written procedures is to constrain police discretion to determine the scope of an inventory search, thereby minimizing its intrusiveness. Commonwealth v. Figueroa, supra at 749; Commonwealth v. Daley, 423 Mass. 747, 751 (1996). Under the Fourth Amendment, it is not clear whether an inventory search not conducted pursuant to standard police procedures is per se unreasonable. Commonwealth v. Ford, 394 Mass. 421, 428 (1985) (Lynch, L. dissenting). However, the SJC has repeatedly stated that Article 14 automatically requires the exclusion of evidence seized during an inventory or storage search not conducted pursuant to standardized written police procedures. Commonwealth v. Ford, supra at 426; Commonwealth v. Bishop, supra at 451; Commonwealth v. Garcia; supra at 681.[4]
Finally, under both the Fourth Amendment and Article 14, a roadblock seizure made without individualized suspicion and designed to detect drunk driving will be reasonable where conducted pursuant to standard, neutral guidelines which constrain the exercise of police discretion. Michigan Department of State Police v. Sitz, 496 U.S. 444, 455 (1990); Commonwealth v. McGeoghegan, 389 Mass. 137, 141-43 (1983); Commonwealth v. Trumble, 396 Mass. 81, 86-87 (1985); Commonwealth v. Anderson, 406 Mass. 343, 347 (1989). However, reasonableness under Article 14 further requires that the roadblock be conducted pursuant to a plan devised in advance, including the date, location, time, duration and set pattern of cars to be stopped; must be controlled on site by law enforcement supervisory personnel; and must be located in areas with a recent history of accidents or drunk driving arrests. Commonwealth v. McGeoghegan, supra at 141; Commonwealth v. Trumble, supra at 89; Commonwealth v. Anderson, supra at 350.
In addition, the SJC has rejected the notion that substantial compliance with such a plan, allowing for reasonable deviations by police for practical reasons, will satisfy Article 14. Commonwealth v. Anderson, supra at 349. Rather, in order for a roadblock to be constitutionally reasonable under state law, there must be compliance in full with police guidelines, such that no element of discretion is injected into the roadblock procedures. Id. at 350; Commonwealth v. Cameron, 407 Mass. 1005, 1006 (1990). Accordingly, the extension of a roadblock 15-30 minutes beyond the 2:00 a.m. ending time specified in police guidelines rendered it unreasonable as to motorists seized after 2:00 a.m., such that Article 14 required the suppression of evidence gathered from them. Commonwealth *30 v. Anderson, supra at 350-51. Further, the selection of a site for a roadblock based on stale, two-year-old information rendered it unreasonable under Article 14. Commonwealth v. Donnelly, 34 Mass.App.Ct. 953, 955 (1993).
Thus, several of the cases where the SJC has deemed Article 14 to provide more substantive protection than does the Fourth Amendment involve administrative-type searches unsupported by probable cause. This precedent is of no avail to Garner, however, since what is at issue in the present case is the constitutionality of the method chosen by police to execute search and arrest warrants issued upon probable cause.
Miscellaneous Cases
Beyond the above-mentioned categories, the remaining cases in which the SJC has found Article 14 to be more protective than the Fourth Amendment involve disparate concerns and do not lend themselves to a coherent analysis. For example, although warrantless surveillance undertaken with the consent of one of the parties to the conversation does not constitute an unreasonable search and seizure under the Fourth Amendment, the SJC has concluded that electronic eavesdropping conducted without the consent of all parties to a conversation violates Article 14 unless there are exigent circumstances justifying war-rantless surveillance. United States v. White, 401 U.S. 745, 751 (1971); United States v. Caceres, 440 U.S. 741, 750-51 (1979); Commonwealth v. Blood, 400 Mass. 61, 74, 76-77 (1987). In reaching this conclusion, the SJC noted the historical opposition in Massachusetts to British search policies involving the use of general warrants known as writs of assistance, which were considered “the worst instrument of arbitrary power . . . that places the liberty of every man in the hands of every petty officer,” and the fact that the colonial aversion to such practices prompted the adoption of Article 14 to condemn unreasonable searches and seizures. Commonwealth v. Blood, supra at 71. Thus, the court concluded that allowing war-rantless surveillance based upon the consent of only one party to the conversation similarly “puts the conversational liberty of every person in the hands of any officer lucky enough to find a consenting informant.” Id. at 71-72.
Moreover, under the Fourth Amendment, in order to prevent the fruits of an illegal search and seizure from exclusion, the government need only demonstrate by a preponderance of the evidence that the evidence would ultimately have been discovered by lawful means. Nix v. Williams, 467 U.S. 444, 431 (1984). However, the SJC has stated that this “more probable than not" standard of discovery dilutes the meaning of the word “inevitable.” Commonwealth v. O’Connor, 406 Mass. 112, 117 (1989). Thus, application of the inevitable discovery rule under Article 14 requires a more rigorous analysis under which the commonwealth must first establish the facts bearing on inevitability by a preponderance of the evidence and then demonstrate with a high level of specificity and factual detail that discovery of the information at issue was certain as a practical matter, id. at 117; Commonwealth v. Perrot, 407 Mass. 539, 546-47 (1990). In addition, unlike the Supreme Court, the SJC has stated that it will consider the character of the police misconduct in deciding whether to admit evidence that would inevitably been discovered. Commonwealth v. O’Connor, supra at 118; Commonwealth v. Perrot, supra at 547. Thus, evidence seized in violation of a search warrant requirement will not be admitted even if its subsequent lawful discovery was inevitable. Commonwealth v. Perrot, supra at 547.
Finally, the U.S. Supreme Court has never addressed whether the Fourth Amendment requires police searching pursuant to a warrant to exhibit or deliver that search warrant to the premises being searched. However, the SJC has held that Article 14 implicitly requires law enforcement officials to possess a copy of a warrant when executing it, unless there are exigent circumstances justifying a warrantless search. Commonwealth v. Guaba, 417 Mass. 746, 754 (1994). The SJC reasoned that this requirement guides police as to the permissible scope of the search, and puts the occupant of the premises to be searched on notice of the police’s authority to search and the reasons for the search. Id. at 755. Thus, under Article 14, a search conducted without exhibiting the warrant is unreasonable per se, rendering the search warrantless. Id.
This Court cannot discern a single principle or rationale underlying these remaining cases in which the SJC has found Article 14 to be more protective than the Fourth Amendment. The SJC itself has provided little insight into its methodology, noting only that there is a “special category” where “article 14 and Fourth Amendment law diverge.” Commonwealth v. Cast, 407 Mass. 891, 907 (1990). However, the Court has suggested on at least one occasion that a defendant arguing for greater protection under Article 14 bears the burden of advancing a “compelling reason” for the court to find such protection. Id. at 907-08 (noting that defendant’s argument that Art. 14 forbids search of closed container found in an otherwise lawful warrantless automobile search would unnecessarily burden the police and criminal justice system, while providing defendants with insignificant protections against privacy intrusions).
As previously discussed, the substantive provisions of Article 14 generally parallel those of the Fourth Amendment and the instances in which Article 14 has been deemed more protective are relatively few. This Court therefore starts with the assumption that the standards of reasonableness with respect to the police method of executing a search warrant are identical under the state and federal constitutions. Moreover, this Court has not found, nor has the defendant *31 produced, any Massachusetts precedent for the proposition that reasonableness in the use of force under Article 14 differs from reasonableness in the use of force under the Fourth Amendment.[5]
Nonetheless, Garner urges this Court to find that the deployment of a stun grenade to execute a search warrant constitutes deadly force and thus is per se unreasonable under Article 14 whenever there are children known to be present in the dwelling to be searched, or when used under any circumstance short of a hostage situation. In support of this position, Garner cites an incident in Fitchburg where the deployment of a stun grenade during a drug raid sparked a fire that left 12 families homeless, injured six police officers and two firefighters, and caused $150,000 in damage to the building, and an incident in California in December of 1984 where a stun grenade launched into an apartment exploded between the wall and a woman’s back, killing her.[6] However, the fact that the deployment of a stem grenade has proven to be dangerous in two other cases does not compel the conclusion that the use of such a device per se constitutes unreasonable, excessive force. Rather, the Fourth Amendment and Article 14 require a case by case determination of reasonableness based on all the facts and circumstances of a particular search.
This Court concludes that Garner has failed to advance a compelling reason why this Court should find that the method of executing a search warrant falls within that special category where Article 14 and Fourth Amendment law diverge. See Commonwealth v. Cast, supra at 907. Thus, this Court concludes that under Article 14 of the Massachusetts Declaration of Rights, the New Bedford police deployment of a stun grenade to execute the search warrant in the present case must be analyzed under the same standard of reasonableness under the circumstances imposed by the Fourth Amendment.
Given that this Court has already found the relevant facts, it is bound by the SJC’s analysis of reasonableness in the present case. The reasonableness under the circumstances of the chosen method of executing a warrant in a particular case is a matter of law and not one of discretion. The SJC has weighed all the relevant factors in this case, including the nature of the crime alleged to have been committed, the strong probability that the defendants were armed, the presence of children in the apartment, and the unfortunate circumstance that the grenade was deployed in the very room where a four-year-old child was present, and concluded that the manner of executing the warrant was reasonable.
Regardless of any lingering reservations this Court may have concerning the use of potentially dangerous pyrotechnic diversionary devices by police, it must adhere to the constitutional standards set forth by the SJC. Accordingly, this Court concludes that the execution of the warrant in the present case was reasonable under Article 14 such that the evidence seized should not be suppressed.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant Derek Garner’s motion to suppress the evidence seized at 1261 Church Street, Building D, Apartment 39 pursuant to Article 14 of the Massachusetts Declaration of Rights be DENIED.

 Because Officer LaVoie never testified at either hearing, it is unclear whether or not he looked into the back bedroom to determine if it was occupied before deploying the grenade there.

 “Deadly force” is defined in this Commonwealth as force intended or likely to cause death or great bodily harm. Commonwealth v. Klein, supra at 827; Commonwealth v. Cataldo, 423 Mass. 318, 321 (1996).

 Indeed, several members of the SJC have accused the court of taking a result-oriented approach to its determinations in this area:
It seems that whenever we wish to expand the rights of defendants in criminal cases, we simply invoke the Massachusetts Constitution without so much as a plausible argument that the Massachusetts Constitution requires the expansion. The court decides on the result that it wants and simply declares, if the result is more favorable to a criminal defendant than Federal law permits, that the Massachusetts Constitution compels such a result without the faintest suggestion of authority either in the language of the Massachusetts Constitution or elsewhere.
Commonwealth v. Amendola, supra at 603 (Nolan, J. and Lynch, J., dissenting).
Once again a majority of this court has found some hidden meaning within article 14 of the Massachusetts Declaration of Rights to deviate from a decision of the United States Supreme Court in a question concerning the Fourth Amendment to the United States Constitution ... What is of paramount concern today is that the majority opinion is totally devoid of any standard used to deviate from the position of the Supreme Court.
Guiney v. Police Commissioner of Boston, 411 Mass. 328, 334 (1991) (Nolan, J., dissenting).

 The SJC has stated, however, that a minor deviation from written standards, such as the failure to obtain the signature of the tow truck operator on the inventory form, will not necessarily render an inventory search unreasonable under Article 14, requiring suppression of the evidence. Commonwealth v. Garcia, supra at 681.

 It should be noted that in reviewing the present case and reaching its decision under the Fourth Amendment, the SJC faced a “paucity of federal precedent” on the reasonableness of the method of executing a search warrant. Commonwealth v. Garner, supra at 743. Thus, the SJC was free to articulate the Fourth Amendment standard as it saw fit and there is no reason to believe that if the court had decided the case under Article 14 it would have reached a different result.

 Despite this incident, the Supreme Court of California has held that the use of pyrotechnic diversionary devices in executing warrants does not constitute unreasonable and excessive force under the state and federal constitutions. Langford v. Superior Court, 729 P.2d 822, 826-27 (Cal. 1987).