Commonwealth *v.* Eason.

## COMMONWEALTH *vs.* JOHN EASON.

No. 96-P-90.

Essex. September 19, 1996. - July 8, 1997.

Present: WARNER, C.J., ARMSTRONG, BROWN, DREBEN, JACOBS, PORADA, & IRELAND, JJ.[1]

Further appellate review granted, 425 Mass. 1108 (1997).

*Eavesdropping. Search and Seizure,* Electronic surveillance. *Practice, Criminal,* Assistance of counsel. *Privacy. Constitutional Law,* Search and seizure, Privacy.

At the trial of indictments, in which the Commonwealth introduced evidence of intercepted telephone conversations with the defendant, the Commonwealth carried its burden of demonstrating that the interception was made in the course of an investigation of a designated offense within the meaning of G. L. c. 272, §§ 99 B 4 and 99 B 7, thus the eavesdropping was not in violation of G. L. c. 272, § 99 P 2; any failure of trial counsel to rely on that statute in moving to suppress the tape recordings of the conversation did not harm the defendant. [119-120]

Police officers' warrantless initiation, monitoring, and recording of two telephone calls to the defendant with the consent of the caller violated the defendant's reasonable expectation of privacy guaranteed by art. 14 of the Massachusetts Declaration of Rights. [120-125] JACOBS, J., dissenting, with whom ARMSTRONG & BROWN, JJ., joined. ARMSTRONG, J., dissenting.

At the trial of criminal indictments, defense counsel's failure to object to certain evidence obtained as a result of police officers' unlawful warrantless interception of telephone conversations with the defendant created a substantial risk of a miscarriage of justice; a new trial was required. [125-126] JACOBS, J., dissenting, with whom BROWN & ARMSTRONG, JJ., joined. ARMSTRONG, J., dissenting, expressed the view that the appropriate analysis is whether there was effective assistance of counsel.

INDICTMENTS found and returned in the Superior Court Department on May 11, 1994.

A motion to suppress evidence was heard by *Patrick F. Brady,* J., and the cases were tried before him.

---

[1]After circulation of the opinion to the other Justices of the Appeals Court, the panel was expanded. See *Sciaba Constr. Corp.* v. *Boston,* 35 Mass. App. Ct. 181, 181 n.2 (1993).

*Paul J. Molloy* for the defendant.

*Susanne G. Levsen*, Assistant District Attorney, for the Commonwealth.

DREBEN, J. On January 1, 1993, two masked persons dressed in black with silver faces broke into George Allison's apartment in Haverhill, assaulted him with mace, and shot his two dogs. At the time, law enforcement officers from Massachusetts and New Hampshire were actively involved in a narcotics investigation in cooperation with the Federal Drug Administration. The investigation targeted marihuana dealers in New Hampshire and in the Haverhill area, as well as suppliers in Arizona, California, Colorado, and Texas. The victim of the home invasion, George Allison, had cooperated with the officers, and they believed that the home invasion may have been related to their ongoing narcotics investigation.

On April 13, 1993, two State troopers, one from Massachusetts and one from New Hampshire, visited Rita Disorbo, who, they were told, had information about the January 1 incident. While at her apartment, they persuaded her to make two calls to the defendant at his home. When the defendant received the calls, he was unaware that police officers were in Disorbo's apartment, listening on an extension telephone and tape recording the conversation with her, albeit reluctant, consent.

Subsequently, the defendant was indicted and convicted of a series of crimes arising from the home invasion.[2] The evidence at trial included the testimony of the two State troopers recounting admissions made by the defendant in his telephone conversations with Disorbo.

The defendant appeals from his convictions, relying in large part on his claim that the officers' eavesdropping, without a warrant, violated both the Massachusetts wiretap statute, G. L. c. 272, § 99, and his expectation of privacy under art. 14 of the Massachusetts Declaration of Rights. He also asserts prejudicial evidentiary error and conflict of interest and ineffectiveness on the part of his trial counsel. We reverse the convictions.

Prior to trial, the defendant filed two separate motions in limine "to exclude tape recorded conversation" and "to suppress the

[2]The defendant was convicted of armed burglary (G. L. c. 266, § 14), assault and battery with a dangerous weapon (G. L. c. 265, § 15A), two counts of cruelty to animals (G. L. c. 272, § 77), and possession of ammunition (G. L. c. 269, § 10[*h*]).

tape recording and the tape recorded conversation between the defendant and Rita [Disorbo] . . . ." The first motion claimed that a purported authorization for the tape recording by a Federal Drug Enforcement agent was invalid and violated the defendant's Federal constitutional rights "as well as Article Fourteen of the Massachusetts [Declaration] of Rights" and the "surveillance statute of the Massachusetts General Laws." The stated grounds of the second motion were that the statements attributed to the defendant in the telephone calls were involuntary and the product of coercion. At a pretrial hearing on these motions, the Commonwealth informed the judge that it intended to offer only the testimony of Disorbo and the State troopers but not the tape recording. Thereupon the judge declared the motion to exclude the tape recorded conversation moot, and that he would endorse it with the notation "no action necessary." No objection was made to this disposition. The judge denied the motion to suppress after hearing evidence on the question of voluntariness. He issued written findings and rulings in which he found the telephone conversations to be voluntary.

Based on his determination that the only two witnesses testifying at the hearing on the motion to suppress, Rita Disorbo and State Trooper Thomas Coffey, were credible, the judge concluded as follows. The two troopers, acting on information they had received, visited Disorbo at her residence to ask her about the invasion. They informed her that if she would not cooperate, they would subpoena her to testify before the grand jury. Although she hesitated at first, she told them that the defendant had been living with her at the time of the incident and had told her that he and others had participated in it. At the troopers' request, Disorbo reluctantly agreed to place a telephone call to the defendant while they listened on an extension telephone in her apartment and also recorded the conversation.[3] One of the troopers dialed the defendant's number, and Disorbo, without disclosing that the troopers were present, told the defendant that the police had been asking about the home

---

[3]Trooper Coffey testified that both troopers had listened to the conversations between Disorbo and the defendant on an extension in her home and had tape recorded the conversations by using a "tape recorder with a suction cup on it." While Coffey did not explain how this equipment was employed, he stated it was used to record and not to "tap" into the phone. He further stated that authorization to record the conversations had been obtained from Federal authorities "under their one-party consent rules."

invasion. The defendant told her to say nothing, and after informing her that nobody knew about the incident, ended the phone call. Asked by the troopers to call the defendant a second time, Disorbo did so and told him that the police wanted to speak with her and that she was nervous. He told her not to worry, that Allison could not recognize him, and only the participants, his girlfriend, and Disorbo knew who had been involved in the incident.

On the day of trial, prior to jury selection, the judge expressed his understanding that the troopers heard the conversation because a suction device had been attached to the ear portion of the extension phone which had been connected to a tape recorder. He asked the defendant's counsel whether he was arguing that the device was "a violation of [G. L. c.] 272, § 99, the eavesdropping statute," to which defendant's counsel replied, "No, your Honor, not at this point."

At trial, the only witnesses were Allison, who described the incident but was unable to identify the participants; Rita Disorbo; her husband, Paul Chambers, whom she had married subsequent to the April eavesdropping; and the two troopers. Chambers, Disorbo's then boyfriend, had been incarcerated from September 1992 until March 15, 1993. While Chambers was in jail, Disorbo had a relationship with the defendant. It ended after Chambers was released, at which time the defendant moved out of Disorbo's apartment. Both Disorbo and Chambers testified that the defendant had admitted to them that he had participated in the invasion, Disorbo basically repeating at trial the testimony she had given at the hearing on the motion to suppress. Disorbo and Chambers also stated that the defendant had offered them money not to testify against him. The two troopers related the conversations they had overheard in Disorbo's apartment, in much greater detail than Disorbo's account — refreshed perhaps by the tape recording.

The main focus of the defendant's appeal is that the testimony of the State troopers obtained by their warrantless eavesdropping should have been excluded, both on the basis of G. L. c. 272, § 99, the wiretap statute, and art. 14 of the Massachusetts Declaration of Rights. Counsel claims that there can be no doubt that the troopers' testimony immeasurably bolstered Disorbo's and Chambers's credibility.

Although trial counsel alluded to both the statute and art. 14 in his written motions, and although his primary focus at trial was to keep the defendant's statements away from the jury and to preclude the troopers from testifying as to what they had overheard,[4] appellate counsel recognizes that trial counsel may have insufficiently objected on the statutory and State constitutional grounds. Accordingly, he argues that the admission of the troopers' testimony created a substantial risk of a miscarriage of justice and that trial counsel was ineffective as his failure to pursue these grounds cannot be explained as a tactical decision.

We agree that the troopers' testimony corroborating the testimony of Chambers and Disorbo was immensely important to the prosecution. This is underscored by the prosecutor's closing in which he stated:

> "Now, what about the identification evidence, because that is, of course, the key in this case. Now, I'd suggest to you the central fact is the telephone conversation. I want to focus on that because, you know, you can say all you want about Rita Chambers and Paul Chambers and cast some arrows at them with respect to their believability, their credibility, perhaps, but is there really any dispute with respect to the content of the telephone conversation, because that's when these people come together. And you have Trooper Tom Coffey and you have Trooper Robert Quinn who, in addition to Rita Chambers, told you what that telephone conversation was. And I suggest to you that in that telephone conversation the defendant made admissions indicating his direct involvement in this home invasion."

The prosecutor later reiterated:

> "Now, if you had those two people standing alone, you might well want to question, you know, their background or whatever. But what I'm suggesting to you is put those two witnesses and their direct admissions, their direct observations, together with that telephone call conversation. And, if you put those three things together, the telephone conver-

---

[4]At the hearing on the motion to suppress, defense counsel argued that "the two people listening in should not be able to testify to something that they should not have heard." At trial, counsel tried to exclude the testimony of one of the troopers on hearsay grounds.

sation and the testimony of those two witnesses, doesn't it all go into one piece and tell you that, yes, those two witnesses are telling the truth, because it fits with that telephone call conversation wherein the defendant makes admissions to Trooper Coffey and Trooper Quinn? And, then, the credibility of these other two witnesses, I suggest to you, is less of an issue."[5]

We examine whether there has been a statutory or art. 14 violation.

1. *Interception under G. L. c. 272, § 99.* "For purposes of the statute, interception is defined as the use of an intercepting device to secretly hear or record, or aid another to secretly hear or record, the contents of any wire or oral communication. G. L. c. 272, § 99 B 4." *Commonwealth* v. *Thorpe*, 384 Mass. 271, 275 (1981), cert. denied, 454 U.S. 1147 (1982). A telephone conversation is within the statutory definition of § 99 B 1 and 2, and the use of Disorbo's extension (and recording equipment to enable both troopers to listen simultaneously) was an "intercepting device" within § 99 B 3. See *Campiti* v. *Walonis*, 611 F.2d 387, 392, 395 (1st Cir. 1979). Compare *Commonwealth* v. *Vieux*, 41 Mass. App. Ct. 526, 533 (1996).

As in *Thorpe*, the defendant's primary argument for suppression of the conversation pursuant to § 99 P 2 is that the Commonwealth has not satisfied its burden under § 99 B 4 to show a nexus with organized crime. A number of interrelated provisions of § 99, as amended by St. 1968, c. 738, § 1, must be examined in connection with this claim. The first section is § 99 B 4, which, in relevant part, provides:

> "[I]t shall not constitute an interception for an investigative or law enforcement officer . . . to record or transmit a wire or oral communication if the officer . . . has been given prior authorization to record or transmit the communication by . . . a party [to the conversation] and if recorded or

---

[5]The prosecutor referred to the troopers a third time, saying:

"There is really no doubt about it, is there? You don't have to depend on Rita Chambers' credibility with respect to the phone call conversation. Two State troopers tell you exactly what it was, what his statements were."

transmitted in the course of an investigation of a *designated offense* as defined herein." (Emphasis supplied.)

A "designated offense" is defined in § 99 B 7 and includes several described crimes[6] "in connection with organized crime as defined in the preamble" to § 99. The preamble, § 99 A, states, in part, that "[o]rganized crime . . . consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services."

At a suppression hearing, the burden is on the Commonwealth to show "[a]t the minimum . . . that the decision to intercept was made on the basis of a reasonable suspicion that interception would disclose or lead to evidence of a designated offense in connection with organized crime." *Commonwealth* v. *Thorpe*, 384 Mass. at 280-281. As set forth in the testimony at the hearing on the motion to suppress, the troopers were in the midst of a multi-State narcotics investigation, and they believed that the Allison break-in might be related to that investigation at the time they interviewed Disorbo, and they so informed her. These circumstances met the Commonwealth's burden. See *Commonwealth* v. *Price*, 408 Mass. 668, 671 n.2 (1990). Compare *Commonwealth* v. *Jarabek*, 384 Mass. 293, 296 (1981). That the troopers' belief later proved erroneous does not retroactively vitiate the reasonable suspicion made in good faith at the time of the eavesdropping.[7] Accordingly, the eavesdropping was not in violation of G. L. c. 272, § 99 P 2, and any failure of trial counsel to rely on that statute did not harm the defendant. Cf. *Commonwealth* v. *Vieux*, 41 Mass. App. Ct. at 533.

2. *The defendant's right of privacy under art. 14.* Relying principally on *Commonwealth* v. *Blood*, 400 Mass. 61 (1987), the defendant claims that the warrantless monitoring by the police of his telephone conversations with Disorbo violated art. 14.[8] A privacy interest is protected under art.

---

[6]Two of the crimes for which the defendant was indicted, see note 2, *supra* — burglary and assault and battery by means of a dangerous weapon — are listed in the statute, as is "any offense involving the possession or sale of a narcotic. . . ."

[7]It appears that the break-in was not linked to the ongoing drug investigation.

[8]Article 14 provides: "Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places,

14 "when it is shown 'that a person [has] exhibited an actual (subjective) expectation of privacy,' and when that 'expectation [is] one that society is prepared to recognize as "reasonable.' " *Katz* v. *United States,* [389 U.S. 347, 361 (1967)] (Harlan, J., concurring)." *Commonwealth* v. *Blood,* 400 Mass. at 68. There is no doubt that the defendant had such a subjective expectation; the only question is whether Massachusetts law, in contrast to Federal law, recognizes as reasonable the privacy interest invaded here. The cases decided by the Supreme Judicial Court, as discussed below, strongly indicate that a warrant is required. Accordingly, we hold that the warrantless police initiation and monitoring (and recording) of the two telephone calls in this case, unbeknownst to the defendant, was not permissible under art. 14.

"It is by now firmly established" that in some circumstances art. 14 affords more substantive protection to individuals than that which prevails under the Constitution of the United States. *Commonwealth* v. *Stoute,* 422 Mass. 782, 787 n.10 (1996). *Commonwealth* v. *Blood,* 400 Mass. at 68 n.9. Thus, a "conclusion that the defendant does not enjoy a reasonable expectation of privacy under the Fourth Amendment does not compel a similar conclusion regarding the reasonableness of the defendant's expectation of privacy under art. 14." *Commonwealth* v. *Cote,* 407 Mass. 827, 834 (1990). See *Commonwealth* v. *Panetti,* 406 Mass. 230, 233-234 (1989).

More specifically, Massachusetts has not adopted the Federal view that surveillance with the consent of one party to a conversation usually passes constitutional muster. The Supreme Judicial Court has rejected the rationale for that position. The Federal basis for upholding warrantless electronic surveillance with the consent of one party is that "when one speaks one voluntarily assumes not only the risk that one's listener may repeat what one says to others, but also the risk that the listener may be recording or monitoring the conversation for broadcast to others." *Commonwealth* v. *Thorpe,* 384 Mass. at 282, citing *United States* v. *White,* 401 U.S. 745, 751 (1971), and other cases. The court in *Thorpe* noted that this "assumption of the risk" approach has

or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure; and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws."

been criticized and that at least two State Supreme Courts — Michigan[9] and Alaska — had, at the time, interpreted State constitutional provisions to bar warrantless monitoring and recording without the consent of the speaker. *Id.* at 283, and authorities cited. See *State* v. *Glass*, 583 P.2d 872, 881 (Alaska 1978); *State* v. *Thornton*, 583 P.2d 886, 887 (Alaska 1978) (recording of telephone conversations with the consent of a police informant without defendant's knowledge violated Alaska Constitution); *State* v. *Blow*, 157 Vt. 513, 518-519 (1991).

Quoting from opinions in accord with Justice Harlan's dissent in *United States* v. *White*, 401 U.S. at 787-789, as well as from the dissent itself, the court in *Thorpe* was much concerned with the possible chilling effect on First Amendment values if one suspected that conversations were being transmitted for the ears of other than one's intended audience. "[W]ords would be measured a good deal more carefully and communication inhibited."[10] "Our laws must ensure that the ordinary, law-abiding citizen may continue to engage in private discourse, free to speak with the uninhibited spontaneity that is characteristic of our democratic society." *Commonwealth* v. *Thorpe*, 384 Mass. at 284, quoting from *People* v. *Beavers*, 393 Mich. 554, 566, cert. denied, 423 U.S. 878 (1975).[11]

Turning to the governmental intrusion in the case before it, the court proceeded to "assess the nature of the particular form of warrantless surveillance and its likely impact on the individual's sense of security that is the concern of art. 14's protection against unreasonable searches and seizures." 384 Mass. at 285. The factual circumstances were that a police officer, known to the speaker as a police officer and sought out by him, recorded eight telephone conversations and two face-to-face conversations between the speaker and the officer. Holding that there was no constitutional violation, the court concluded that "free speech and privacy values are [not] unduly threatened by the risk that when one speaks to a known police officer he may be recording the conversation." *Ibid.* Nevertheless, the

[9]But see note 11, *infra.*

[10]*Commonwealth* v. *Thorpe*, 384 Mass. at 284, quoting from *United States* v. *White*, 401 U.S at 787 (Harlan, J., dissenting).

[11]*Beavers*, as pointed out by the dissenters, is no longer law in Michigan. *People* v. *Collins*, 438 Mich. 8 (1991).

court cautioned:

> "[I]t is apparent from the above reasoning of other jurisdictions that the better future course, and the most secure course constitutionally, is for law enforcement officials to procure warrants in cases where probable cause for surveillance can be shown, and even in cases where it does not appear that the statutes require a warrant." *Id.* at 286.

After *Thorpe*, the Supreme Judicial Court decided *Commonwealth* v. *Blood*, 400 Mass. at 70-71 & n.11, which involved face-to-face conversations in private homes transmitted to, and recorded by, police. Because one party, an informant, had consented to the interception, the conversations were not unlawful under G. L. c. 272, § 99, nor under Federal law. The court, however, squarely rejected the Federal position that the consent of one participant was sufficient to justify the warrantless surveillance. "The vice of the consent exception is that it institutionalizes the historic danger that art. 14 was adopted to guard against." *Id.* at 71. The surveillance was held to be in violation of art. 14, despite its constitutionality under the Fourth Amendment to the United States Constitution and its meeting the requirements of G. L. c. 272, § 99 B 4.[12]

*Commonwealth* v. *Fini*, 403 Mass. 567, 573 (1988), concerned surveillance similar to the transmissions in *Blood, supra*. The "magnitude of the unconstitutional intrusion" was so significant that "half measures of deterrence [were] not enough." Despite the oft-employed practice of permitting unlawfully obtained evidence to be used for impeachment purposes, the court in *Fini* not only considered the evidence inadmissible in the government's case-in-chief but also held that it must be excluded for impeachment purposes.

In *Commonwealth* v. *Cote*, 407 Mass. at 833, the defendant, relying on *Commonwealth* v. *Blood, supra*, attempted to suppress telephone message records under art. 14. The defendant had arranged through a client of Allied (an answering service) for the answering service to take messages for the defendant on

---

[12]In *Commonwealth* v. *Penta*, 423 Mass. 546, 552-553 (1996), the Supreme Judicial Court analyzed and upheld a warrant procured by the police for electronic surveillance. There is no suggestion that a warrant was not required although the transmission and surveillance occurred in the informant's, rather than the defendant's, home.

the client's telephone line. In refusing to suppress the messages, the court carefully pointed out that the defendant chose a method of receiving telephone messages in which *both* the defendant and any caller were well aware of the involvement of a third party, an answering service. *Id.* at 834. Even in such a case,

> "It may be that under art. 14 exposure of information to another party might not compel the rejection of a claim of a reasonable expectation of privacy, particularly in light of the fact that the third party here, Allied [the answering service], considered the telephone message records to be confidential. However, . . . the defendant knew that his messages were being taken not on his own telephone line but on [the telephone line of the answering service's client]. This arrangement subjected the defendant's messages to exposure, not only to the employees of [the answering service] but also to anyone entitled to examine the telephone message records of the [client]." *Id.* at 835.

The *Cote* court distinguished *Blood* by saying:

> "[W]e addressed a situation involving the surreptitious recording of conversations held in private homes in which at least one party to the conversation was unaware of the fact that their words were being recorded. In the present case, *both* the defendant and any callers who left a message for him at [the answering service] intended that their words be recorded. Therefore, our analysis in *Blood* does not apply to the facts of this case." *Ibid.* (emphasis supplied).

While the dissenters in the present case lay stress on the difference between the face-to-face discourse held impermissible in *Blood* and the telephone conversations here, we do not consider the inability of a telephone speaker to control completely the listening environment a conclusive difference — at least where, as here, without any exigent circumstances, and without a warrant, the police officers induced a reluctant caller to engage the defendant in his home in what would seem to him to be most private telephone conversations and then listened in and recorded the conversations. Considering the "vital role that

the . . . telephone has come to play in private communication," *Katz* v. *United States*, 389 U.S. at 352, this serious governmental intrusion is contrary to the expectation of privacy which Massachusetts is prepared to recognize and which is reflected in our cases. Moreover, even if society is more wary in its expectations, as suggested by the dissenters, we would find this secret surveillance impermissible without a warrant.

> "Since it is the task of the law to form and project, as well as mirror and reflect, we should not, as judges, merely recite the expectations and risks without examining the desirability of saddling them upon society. The critical question, therefore, is whether under our system of government, as reflected in [art. 14], we should impose on our citizens the risks [of police eavesdropping] without at least the protection of a warrant requirement." *United States* v. *White*, 401 U.S. at 786 (Harlan, J., dissenting).

We conclude a warrant was required.

Having reached this conclusion, we also consider the intrusion so significant, cf. *Commonwealth* v. *Fini*, 403 Mass. at 573, the officers' testimony so crucial in the context of the trial, and the failure of counsel to object so devoid of tactical explanation that this is one of the exceptional cases where the defendant has met his heavy burden of showing that there is here a

substantial risk of a miscarriage of justice.[13, 14]

*Judgments reversed.*

*Verdicts set aside.*

JACOBS, J. (dissenting, with whom Armstrong and Brown, JJ., join). I respectfully dissent.

---

[13]We are aware that *Commonwealth* v. *Amirault*, 424 Mass. 618, 651 (1997), quoting from *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 n.22 (1986), stated that the substantial risk of a miscarriage of justice exception of *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967), "would *generally* not be available to a defendant prejudiced by the unobjected-to admission of highly incriminating evidence obtained in violation of Fourth Amendment protections" (emphasis supplied).

The dissent's characterization of this dictum — neither *Miranda* nor *Amirault* involved an unreasonable search — as a "settled appellate principle" is not borne out by the cases. *Commonwealth* v. *Scala*, 380 Mass. 500, 510 (1980). Cf. *Commonwealth* v. *Sawyer*, 389 Mass. 686, 695-696 (1983). The holding in *Commonwealth* v. *Bart B.*, 424 Mass. 911, 914 (1997) — unless the omission of counsel presents a substantial risk of a miscarriage of justice, there is no basis for a claim of ineffective assistance of counsel — is also not consistent with the "settled" appellate principle found by the dissent.

The discussion in *Amirault*, 424 Mass. at 646, moreover, was in the context of collateral review of a "completely adjudicated conviction," where the defendants had had ample opportunities to raise the issue both at trial and on appeal. *Id.* at 642, 644. Here, the art. 14 issue, although probably not sufficiently raised at trial with reference to the eavesdropping officers, is being raised on the defendant's direct appeal where the concerns of finality expressed in *Amirault* are inapposite. In any event, even if there is a "general" rule applicable to direct appeals, we do not consider this case as falling within such rule in view of the gravity of the intrusion.

In addition to the claim that there is here a substantial risk of a miscarriage of justice, appellate counsel argues trial counsel's failure to focus on art. 14 was ineffective assistance of counsel. We find it unnecessary to discuss whether counsel was ineffective, see *Commonwealth* v. *Curtis*, 417 Mass. 619, 624 n.4 (1994); *Commonwealth* v. *Amirault*, 424 Mass. at 652 n.24; *Commonwealth* v. *Bart B.*, 424 Mass. at 914, but our declining to reach the issue is not to be taken, as the dissenters suggest, as a determination that the decided cases under art. 14 did not provide sufficient guidance for an ordinary fallible lawyer to know that a viable issue under art. 14 was here involved.

[14]Other issues raised in the defendant's appeal need not be discussed as they are unlikely to arise on retrial. Suffice it to say that the hearsay statements of a prisoner who was incarcerated with Paul Chambers claiming that he was not involved in the home invasion should not be admitted.

In *Commonwealth* v. *Blood*, 400 Mass. 61 (1987), the court found a violation of art. 14 of the Massachusetts Declaration of Rights in circumstances in which face-to-face conversations in private homes were secretly transmitted by an informant to police. Further, the transmitted conversations in *Blood* took place within a "circle of known listeners." *Id.* at 77. In stating that "we need not reconsider the question of the constitutionality of [the statutory one-party consent exemption] in other circumstances, [citing] *Commonwealth* v. *Thorpe*, 384 Mass. 271, 285-286 (1981), cert. denied, 454 U.S. 1147 (1982)," *id.* at 66 n.6, *Blood* implicitly recognized that telephone conversations stand on different constitutional footing and have been accorded different treatment by our statute and prior decisions. It is significant that the Alaska and Vermont cases relied on by the majority do not involve eavesdropping on an extension telephone with the consent of one of the participants. Moreover, the Alaska decisions are grounded, in part, on the "broader protection" afforded by a right to privacy expressly set forth in an amendment to the Alaska Constitution. *State* v. *Glass*, 583 P.2d 872, 878-879 (Alaska 1978). *State* v. *Thornton*, 583 P.2d 886, 887 (Alaska 1978).

*Commonwealth* v. *Thorpe, supra*, is our only decision addressing privacy rights in telephone conversations under art. 14. After first concluding that the warrantless recording by a known police officer of his telephone conversations with the defendant fell within the G. L. c. 272, § 99 B 4, statutory exception for law enforcement officers, 384 Mass. at 281, the court determined there was no violation of art. 14, because "free speech and privacy values are [not] unduly threatened by the risk that when one speaks to a known police officer he may be recording the conversation." 384 Mass. at 285.[1] The *Thorpe* decision left

---

[1] The court in *Thorpe*, citing reasoning of other jurisdictions, cautioned that "the better future course, and the most secure course constitutionally," would be to procure warrants even in instances where it appears the statute does not require one. *Id.* at 286. *Thorpe* cited with approval the decision in *People* v. *Beavers*, 393 Mich. 554, cert. denied, 423 U.S. 878 (1975), as reflecting one of two jurisdictions interpreting their constitutional provisions to bar "warrantless monitoring and recording without the consent of the speaker." *Id.* at 283. More recently, *People* v. *Collins*, 438 Mich. 8 (1991), explicitly overruled *Beavers* after a review of developments in electronic monitoring since the *Beavers* decision, and noted that "the highest courts in . . . twenty-four states [of twenty-six] in which the issue has been addressed have ruled that their constitutions do not require a warrant." *Id.* at 35. See also 1 LaFave, Search & Seizure, § 2.2(e), at 447 n.221 (3d ed. 1996) (also collecting cases). See

untouched the analysis in *Commonwealth* v. *Douglas*, 354 Mass. 212, 221-222 (1968), cert. denied, 394 U.S. 960 (1969), where, on facts similar to the present case, the court concluded that there was "[n]o illegal search or other violation of any constitutional . . . provision"[2] where police listened on an extension telephone and the speaker's conversation was recorded with the permission of the receiving party. *Id.* at 222.[3] Thus, I discern no explicit indication in either *Thorpe* or *Blood*, each resting on narrow footing, that art. 14 provides a greater right of privacy in *telephone conversations* than the Fourth Amendment to the United States Constitution in the particular circumstances of the present case.

In any event, I examine anew the defendant's claimed expectation of privacy. As the majority points out, any subjective expectation of privacy that he may have had in the circumstances must also be "one which society could recognize as reasonable." *Commonwealth* v. *Blood*, 400 Mass. at 68. The expectation of privacy espoused by the majority, however, reflects an idealization of the nature of telephonic communications and a rejection of our common experience with multiparty lines, telephone systems comprised of multiple extensions, cordless telephones, and cellular "phones," all of which may, and occasionally do, subject our conversations to uninvited and unknown listeners.

In sharp contrast to face-to-face conversations among known listeners in private homes, telephone communications commonly are transmitted externally from the physical confines of the speaker to a receiver outside of the speaker's control. A telephone speaker, therefore, cannot control the listening environment as one may do in face-to-face conversations with selected listeners in a home or other private setting. "A defendant who speaks incriminating words over the telephone runs the risk that the person with whom he talks may be an informer (see *Hoffa* v.

generally Annot., Eavesdropping on Extension Telephone as Invasion of Privacy, 49 A.L.R.4th 430 (1986 & Supp. 1996).

[2]*Commonwealth* v. *Thorpe*, 384 Mass. at 282, cited *Commonwealth* v. *Douglas*, *supra*, as "involving [a] challenge under [the] Federal Constitution only." See also Kiely, Warrantless Electronic Surveillance in Massachusetts, 67 Mass. L. Rev. 183, 191 (1982).

[3]The "one-party consent" exception, under an earlier version of G. L. c. 272, § 99, was retained through St. 1968, c. 738, § 1, which codified the exception in its current form, now § 99 B 4. See *Commonwealth* v. *Thorpe*, 384 Mass. at 280 n.7.

*United States*, 385 U.S. 293, 302-303 [1966]) or that the conversation [as in *Rathbun* v. *United States*, 355 U.S. 107, 109-111 (1957)] may be overheard on an extension telephone. . . . He also should be held to take the risk that his words may be recorded by his listener." *Commonwealth* v. *Douglas*, 354 Mass. at 221-222. See also *United States* v. *Miller*, 720 F.2d 227, 228 (1st Cir. 1983), cert. denied, 464 U.S. 1073 (1984). It follows that a person's expectation that his spoken words will remain private should decline as his control of the listening environment diminishes. Compare *Commonwealth* v. *Panetti*, 406 Mass. 230, 234-235 (1989) (indicating that a subjective expectation of privacy against warrantless eavesdropping is "more reasonable" under art. 14 when conversing with others in one's home than when the conversation is in a motel or hotel room). See Comment, 24 Suffolk U. L. Rev. 1130, 1136 (1990) ("The emerging trend in this area is that privacy is protected only within the areas where one maintains virtually exclusive control"). Because eavesdropping, with one party's consent, over a telephone extension occurs within a listening environment that is significantly less controlled by the speaker than in the *Commonwealth* v. *Blood* circumstance of a face-to-face communication in the speaker's home, I discern no occasion to extend the protection of art. 14.

The rejection in *Blood* of the "one-party consent" rationale in the circumstances of that case does not control expectation of privacy analysis in other circumstances; specifically, I perceive no mandate for the extension of additional art. 14 protection to telephone speakers. Accordingly, I believe that the defendant's privacy claim is governed by the well-settled proposition developed under Fourth Amendment jurisprudence that "listening in to a telephone conversation on an extension, with the consent of one party, does not violate the rights of the other party . . . ." *United States* v. *Miller*, 720 F.2d at 228, citing *United States* v. *White*, 401 U.S. 745, 753 (1971). Cf. *Commonwealth* v. *Thorpe*, 384 Mass. at 282. See *Rathbun* v. *United States*, 355 U.S. at 111 ("Each party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation. When such takes place there has been no violation of any privacy of which the parties may complain").

Lastly, I am troubled by the majority's interpretation of the "substantial risk of a miscarriage of justice" standard. By adverting to that principle, designed for sparing use in instances of unpreserved error, see *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967), the majority implicitly concludes, as do I, that defense counsel did not adequately preserve the right of privacy issue for ordinary "harmless error" appellate review. In the absence of objection, appellate focus, in contrast to the majority's approach, normally and logically next settles upon whether counsel's failure to object amounted to constitutionally ineffective assistance. That test, in the circumstance of claimed erroneous admission of evidence, permits "but for" review; that is, the case is assessed without the offending evidence. See *Strickland* v. *Washington*, 466 U.S. 668, 694 (1984). Reversal is required if counsel's performance was substandard and "deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Given the majority's view of the damaging impact of the eavesdropping testimony upon the defendant's case, I can only conclude that they avoided this test on the basis of a determination that the ordinary fallible lawyer would not be expected to argue for a departure from settled Federal constitutional law, even if the change is implicitly foreshadowed by State appellate decision, as they claim.

In rushing to the next logically applicable test — whether there exists a substantial risk of a miscarriage of justice — the majority, however, blinks away a settled appellate principle dictating that highly incriminating, but unobjected to, evidence is not removed from the appellate calculus even when it is obtained in violation of constitutional protections against unreasonable searches. That principle, firmly embedded in the first element of miscarriage analysis established by *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 n.22 (1986), and recently endorsed in *Commonwealth* v. *Amirault*, 424 Mass. 618, 650-651 (1997), is not limited to collateral review, as the majority would have it, but merely differentiates among cases in which the offending evidence overwhelmingly establishes the defendant's guilt, as here, and cases in which that evidence is not conclusive. Moreover, the recent conflation of the ineffectiveness of counsel and miscarriage standards for purposes of collateral review in *Commonwealth* v. *Curtis*, 417 Mass. 619, 624 n.4 (1994), and *Commonwealth* v.

*Amirault, supra* at 652 n.24, apparently raising the burden for defendants on new trial motions in criminal cases, reasonably cannot be construed as lowering that burden on direct appeal.

ARMSTRONG, J. (dissenting). I concur completely in the dissenting opinion of Justice Jacobs, but add some remarks to underscore what I think is a misunderstanding in the majority opinion of the effect of recent opinions of the Supreme Judicial Court on the meaning of "substantial risk of a miscarriage of justice" and the relationship between that concept and "ineffective assistance of counsel," two analogous but theoretically distinct vehicles for obtaining appellate consideration of alleged trial errors not preserved for appellate review by appropriate motions or objections at trial.

The misunderstanding arises from a sentence in *Commonwealth* v. *Curtis*, 417 Mass. 619, 625 n.4 (1994), repeated by way of dictum in *Commonwealth* v. *Bart B.*, 424 Mass. 911, 914 (1997), to the effect that, "if an omission of counsel does not present a substantial risk of a miscarriage of justice in a situation such as this, there is no basis for an ineffective assistance of counsel claim under either the Federal or the State Constitution." Since we all — majority and dissenters alike — assume that an ineffective assistance of counsel claim is theoretically available to a defendant who, like the defendant in this case, seems guilty beyond any question, the majority draw the inference that a claim of substantial risk of a miscarriage of justice is also available to a plainly guilty defendant. In effect the majority treat the *Curtis* sentence as having vitiated what this court said in *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986) — a formulation seemingly accepted and endorsed in *Commonwealth* v. *Amirault*, 424 Mass. 618, 650-651 (1997) — that the first condition for application of the substantial risk of a miscarriage principle is that the case present a genuine question of the guilt or innocence of the defendant. The result is that the majority have produced what I believe is the first case in our jurisprudence to apply the miscarriage of justice standard to reverse the conviction of a defendant who seems guilty beyond doubt of the crime charged.

For the reasons stated by Justice Jacobs, the majority is, in our view, misreading the import of the sentence in *Curtis*. The principle of the *Curtis* decision is that all "collateral" attacks on convictions

— those brought after the processes of direct appeal, including consideration of the original motion for a new trial, have been completed — should be turned aside unless the conviction poses a substantial risk of a miscarriage of justice. *Commonwealth* v. *Curtis*, 417 Mass. at 625. That decision made clear that it was only discussing "the standard of review that an appellate court generally should apply in a postappeal, collateral attack on convictions," *id.* at 621; and, again, "Our attention here is on the denial of a new trial motion filed after a conviction has received appellate review, and not with new trial motions considered before a conviction has been reviewed." *Id.* at 623. Footnote 4 of the *Curtis* decision must be understood in that context. It is discussing *belated* claims of ineffective assistance of counsel — those made *after* direct appeal, or after consideration of a new trial motion. This reading is consistent with Mass.R.Crim.P. 30(c)(2), 378 Mass. 901 (1979) (*"Waiver.* All grounds for relief claimed by a defendant [by way of a new trial motion] shall be raised by the defendant in his original or amended motion. Any grounds not so raised are waived unless the judge in his discretion permits them to be raised in a subsequent motion, or unless such grounds could not reasonably have been raised in the original or amended motion"). Appropriate allowance is thus made in the rule for the fact that a claim of ineffective assistance of counsel often cannot be raised on direct appeal, see *Earl* v. *Commonwealth*, 356 Mass. 181, 183-184 (1969) (concerning claims of error that require consideration of facts outside the record), or even on an original new trial motion (if the defendant is represented thereon by trial counsel); but, subject to those adjustments, even a claim of ineffective assistance of counsel must be raised by the first reasonably available procedural vehicle for review or be treated as waived. Constitutionally based claims such as ineffective assistance of counsel are not different in this respect from claims of error generally. See *Commonwealth* v. *Watson*, 409 Mass. 110, 112 (1991) ("The rule of waiver 'applies equally to constitutional claims which could have been raised, but were not raised' on direct appeal or in a prior motion for a new trial. *Commonwealth* v. *Deeran*, 397 Mass. 136, 139 [1986]"); *Commonwealth* v. *Curtis*, 417 Mass. at 634 & n.13; *Commonwealth* v. *Gagliardi*, 418 Mass. 562, 565 (1994), cert. denied, 513 U.S. 1091 (1995); *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. at 18-19. Were it otherwise, claims for reversal based on

ineffective assistance could "be made years after the conviction and appeal when the trial judge may well no longer be sitting," *Commonwealth* v. *Curtis*, 417 Mass. at 624 n.3, and when it may well be no longer feasible for the prosecution to reassemble its witnesses. Following the *Curtis* decision, a belatedly raised claim of ineffective assistance, like other belated claims, even if considered by the trial judge, will not result in reversal unless the defendant can meet the traditional substantial risk of a miscarriage of justice standard applicable to waived claims.

Two principles emerge from reviewing the line of decisions that Justice Cutter invoked in deciding *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967) ("we employ the rarely used power referred to in *Commonwealth* v. *Conroy*, 333 Mass. 751, 756-757 [1956]"). The first is that use of the miscarriage standard to reverse a conviction historically lay in the discretion of the court. It was always referred to as a power of the court, not a right of the defendant. By definition, it enabled the court to reverse notwithstanding the defendant's failure to preserve his rights. The second is that the question whether to exercise the discretion favorably to the defendant turned on an appraisal of the *entire* record. For example, in *Commonwealth* v. *MacGregor*, 319 Mass. 462, 463 (1946), the court said: "It is assumed that in appropriate instances this court has and will exercise the power to set aside a verdict or finding in order to prevent a miscarriage of justice when a question affecting substantial rights has not been properly raised by exception at trial. An examination of the record here discloses no reason for the exercise of that power." (Citations omitted.) Or, earlier, in *Commonwealth* v. *McDonald*, 264 Mass. 324, 336-337 (1928): "[T]his court has and will exercise the power to set aside a verdict in order to prevent a miscarriage of justice when a decisive matter has not been raised at the trial. A careful examination of this entire record discloses no reason for the exercise of that power." (Citation omitted.) Or, earlier still, in *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 23, 25, 27 (1923): "[I]n appropriate instances the court has and will exercise the power to set aside a verdict in order to prevent a miscarriage of justice when a decisive or pertinent point affecting substantial rights has not been raised by exception at the trial. . . . It is enough to say that a careful examination of the entire record

shows no ground to doubt the correctness of the trial judge in denying the motion [for a new trial] for this reason [alleged ineffectiveness of counsel]."

The *Miranda* decision, 22 Mass. App. Ct. at 21, derived the first criterion or condition, that there be a genuine question of guilt or innocence, from the historical underpinnings of the power as one that was purely discretionary in character, was rarely used, and would not be exercised unless the court was convinced by the entire record that a miscarriage of justice might result from allowing the conviction to stand. We had and still have no doubt that miscarriage of justice was used with its everyday-language connotation: the concern was that an innocent defendant might have been convicted as a result of improperly admitted or excluded evidence or misleading instructions. Compare *McCleskey* v. *Zant*, 499 U.S. 467, 494-495, 502 (1991) (no miscarriage of justice without a colorable showing of factual innocence). Cf. *Murray* v. *Carrier*, 477 U.S. 478, 496-487 (1986) (procedural default excused in extraordinary cases on showing of actual innocence).

Unlike substantial risk of a miscarriage of justice, which was invoked in discretion, ineffective assistance of counsel is a rights-based remedy, deriving from the constitutional right to the assistance of counsel in framing one's defense; it must be considered as an available remedy, consequently, though the defendant be " 'apprehended in flagrante delicto' and the 'evidence of . . . [his] guilt [be] overwhelming.' " *Commonwealth* v. *Saferian*, 366 Mass. 89, 93 (1974), quoting from the report of a special master. The conditions for application of the principle — that counsel's representation fall measurably below the standard of the ordinary, fallible lawyer and that his inadequacies deprive the defendant of an available, substantial ground of defense, *id.* at 96 — will not normally be made out if counsel's alleged failure or omission is attributable to tactical choice, unless the tactical choice is itself manifestly unreasonable. *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978).

The unnecessary loss of a substantial ground of defense and the absence of a tactical reason for the loss parallel the second and third conditions for application of the miscarriage doctrine, as set out in *Miranda*, 22 Mass. App. Ct. at 21 (result might have been different but for the error, and the error is not attributable to tactical choice). The factors that differentiate the two doctrines

are that the substantial risk analysis focuses on the likelihood that an innocent defendant might have been wrongly convicted, while ineffective assistance analysis focuses on the quality of legal representation the defendant received. The first stems from a concern for justice. The second is concerned with the vindication of a defendant's constitutional right to meaningful assistance of counsel in shaping a defense. An omission of counsel that results in the admission of highly incriminating evidence makes the case more apt for ineffective assistance analysis, because it underscores counsel's inadequacy; but it correspondingly makes the case less apt for the application of miscarriage of justice principles.

It is doubtless true that, as observed in *Commonwealth* v. *Curtis*, 417 Mass. at 624 n.3, the concept of a substantial risk of a miscarriage of justice has been expanded since the *Freeman* decision and used more frequently, probably in response to increased regard for fundamental fairness to defendants and increased impatience with observing the punctilio of sometimes complex procedural rules. But in applying miscarriage analysis to a plainly guilty defendant, the majority here cut the doctrine loose completely from its historical moorings and, to my mind, have misapplied it. Equally important, they may well have consigned the *Saferian* standard to desuetude. If a defendant is entitled as of right to reversal simply because his counsel omitted to interpose proper objections to highly incriminating evidence, and the omission is not explainable as reasonable tactical choice, then it is made quite superfluous to prove the core element of *Saferian*: that counsel's representation betray "serious incompetency, inefficiency, or inattention," otherwise stated as "behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer." 366 Mass. at 96.

Given the unsettled state of the law concerning the one-party consent rule, the majority are probably right in declining to tax the defendant's trial counsel with "serious incompetency" for not saving the right objection to admission of the intercepted telephone conversation. It does not follow that the conviction should be reversed anyway. Whatever else may be said of the conviction of this defendant, it is certainly not a miscarriage of justice.